## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **ROBERT WILHOIT, CHRISTINA HARGROVE, GIJI MISCHEL DENNARD, JULIE MAGERS, MEGAN SMALL, REGINA RUSGROVE**, and **LISA MARSHALL,** individually, and on behalf of the class and all others similarly situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> **ASTRAZENECA PHARMACEUTICALS, LP,** <br><br> *Defendant*. | CLASS & COLLECTIVE ACTION Case No.: <br><br> ***Jury Trial Demanded*** |

## <u>CLASS AND COLLECTIVE ACTION COMPLAINT & DEMAND FOR JURY TRIAL</u>

Plaintiffs Robert Wilhoit, Christina Hargrove, Giji Mischel Dennard, Julie Magers, Megan Small, Regina Rusgrove, and Lisa Marshall (collectively, "**Plaintiffs**"), for themselves and on behalf of all others similarly situated, allege, upon personal knowledge as to themselves and upon information and belief as to others, as follows:

## <u>INTRODUCTION</u>

1.      In a hurried sprint to accomplish its stated goal of lowering the average age of its workforce, AstraZeneca, somewhat clumsily, also engaged in religious discrimination.  On April 29, 2022, AstraZeneca executed what was effectively a massive reduction in force ("**RIF**"), terminating up to 200 religious employees who were over the age of 40 who sought exemption to

the company's vaccination mandate.  But the RIF could not be so deep as to endanger profits.  That is why AstraZeneca's approach was brilliant because it allowed the company to not terminate *all* of its older and religious employees, only a sufficiently large group that hit the sweet spot between cutting costs and retaining experienced employees necessary to maintain profitability. The April 29, 2022 mass termination of older employees was a continuation of AstraZeneca's established corporate strategy to cultivate a younger workforce, which has repeatedly come at the expense of older more experienced employees and job candidates.

2.      This is a class and collective action brought by former employees of AstraZeneca Pharmaceuticals LP ("**AstraZeneca**" or "**Defendant**"), alleging violations of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §621 *et seq.* ("**ADEA**"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2 *et seq*. ("**Title VII**"), and the Americans with Disabilities Act of 1990, 42 U.S.C. 12101 *et seq*. ("**ADA**").  Plaintiffs seek damages, including back pay, front pay, liquidated damages, punitive damages, lost benefits, compensatory damages, damages for emotional distress, pain and suffering, reasonable attorneys' fees and costs, declaratory relief, injunctive relief, as well as any other relief to which Plaintiffs are entitled.

3.      AstraZeneca prides itself as being a diverse and inclusive company.   Recently, however, it became apparent to many AstraZeneca employees that "diversity" was not for everyone, and that AstraZeneca's definition of "inclusion" necessarily entailed the exclusion of older employees who held certain religious beliefs.  In AstraZeneca's workplace, all employees were equal, but some were more equal than others.

4.      In or around March of 2021, Mike Hartman ("**Mr. Hartman**"), the U.S. Director of Sales, stated in a nationwide sales presentation that the average age of AstraZeneca's employees

was around 48 and indicated that this was "too high".  Mr.  Hartman then proceeded to emphasize how few of AstraZeneca's employees were under the age of 30 and that the percentage needed to increase.  In subsequent sales meetings in May of 2021, Mr. Hartman reiterated that AstraZeneca had an aging workforce and needed to focus on hiring young talent.

5.      On November 30, 2021, EJ Henry ("**Mr. Henry**"), AstraZeneca's Head of Inclusion and Diversity at that time, emphasized that the company was striving to cultivate a younger workforce and stated that the company was doing poorly at increasing the percentage of employees under the age of 30.   At the highest levels of the company, an out-with-the old, in-with-the-young strategy was announced.  Although that strategy has been pursued since at least 2018, more recently, the plan was ratcheted into high gear and executed with vigor.

6.      The COVID-19 pandemic presented AstraZeneca with a unique and unprecedented opportunity to lower the average age of its workforce.  In or around September of 2021, the company required all workers to declare their vaccination status.  In doing so, the company could see that a large portion of its unvaccinated workforce was older.  Therefore, the company could see that if it implemented a vaccination mandate it would likely hit older workers harder than it would younger workers.

7.       As this corporate scheme was implemented, April 29, 2022 turned out to be a particularly dismal day for AstraZeneca's older religious employees.  With calculated efficiency, AstraZeneca systematically eliminated a large portion of religious employees who were over the age of 40 under the pretense of "workplace safety."

8.      However, the workplace safety rationale was pretext.  By late April of 2022 when the mass termination was being carried out, the underlying workplace safety rationale for

3

AstraZeneca's mandatory COVID-19 vaccination requirement (the "**Mandate**") had evaporated. Simply put, the available COVID-19 vaccines were ineffective, an unfortunate reality that was abundantly clear by at least February of 2022, months before the mass termination was executed. In fact, Plaintiffs believe that AstraZeneca's own business records demonstrate that its vaccinated employees were contracting COVID-19 at very high rates during the relevant timeframes, particularly relative to its unvaccinated employees who possessed natural immunity, including many of the plaintiffs in this case.

9.      Although the company trumpets its commitment to following the science, AstraZeneca refused to recognize natural immunity as satisfying its immunization requirements for U.S. based employees.  This is despite the fact that the strength and durability of natural immunity has been observed through hundreds of years of research and is universally accepted as at least equivalent—but less profitable—to vaccine-based immunity.  The established strength of natural immunity should be unsurprising given that vaccine-based immunization is but an artificial attempt to emulate the mechanisms of natural immunity.  The fact that AstraZeneca thrust the Mandate onto religious employees who had natural immunity in the first place, and then insisted that such employees violate their spiritual convictions, is telling.  Without credible justification, AstraZeneca forced religious workers to choose between violating their faith and continued employment.

10.      The facts also show that AstraZeneca's stated justification of "workplace safety" apparently was not an actual priority for the company.   When AstraZeneca followed through with the mass termination, its vaccinated employees were contracting COVID-19 at high rates, yet the company did not place enhanced safety protocols on those employees.  Additionally, booster shots

4

were highly recommended by the Centers for Disease Control ("**CDC**") in nearly all circumstances (because the initial vaccines were ineffective at providing any lasting protection), but AstraZeneca did not and has not required boosters for its workforce.

11.     Additionally, AstraZeneca's uniform assertion that terminated employees apparently "were not qualified" for religious accommodation is not credible and constitutes pretext.  AstraZeneca provided religious accommodations to a large percentage of employees who requested religious accommodations and accommodated almost all, if not all, of its Florida and Texas based employees.  Clearly, the company was able to accommodate its religious employees without undue hardship.  Further, AstraZeneca only mandated vaccination on its U.S. based workforce, which is confounding given its stated "workplace safety" goal and the fact that it is a multinational corporation with locations across the globe.  Religious employees in AstraZeneca's Texas, Florida, and non-U.S. locations were free to practice their faith free from the threat of termination, and, apparently, those employees did not endanger workplace safety.

12.     In devising a strategy to eliminate older employees, using the Mandate as its weapon of choice, AstraZeneca also violated Title VII by systematically rigging the religious accommodation process to rid itself of as many older religious employees as it possibly could.   If lowering the average age of the workforce was the stated destination, then the sham religious accommodation process was the selected vehicle.

13.     AstraZeneca did not perform an honest, good faith assessment of each religious exemption request.  Once employees submitted a request, canned follow-up questions were sent under the pretense of assessing the validity and sincerity of the employee's religious beliefs.  These questions appeared to have been autogenerated from some type of algorithmic process whereby

pre-formatted questions were sent based on keywords the employee used in their exemption request, such as "abortion," "fetal cells," "Holy Spirit," "Catholic," "church", and "Christian." The follow-up questions were robotic, oftentimes entirely illogical relative to the underlying statement of religious beliefs that had been submitted. Notably, Plaintiffs never directly engaged with any person who had reviewed their accommodations request, and no AstraZeneca employee ever questioned any plaintiff to discern the actual sincerity or religious nature of their beliefs.

14.     After gaining information from these standardized questions, AstraZeneca's company-wide policy for the targeted groups was to "challenge" religious employees' belief systems, even though personal interactions never occurred. According to AstraZeneca, the targeted employees, who were all terminated as a result of maintaining their convictions, were insincere in their beliefs.

15.     However, because an honest good faith evaluation of religious beliefs was never actually performed, the only thing insincere in this case was the accommodations process itself. Simply put, AstraZeneca devised a corporate scheme to purge as many older and religious employees as it credibly could, all under the guise of advancing "workplace safety."

## JURISDICTION AND VENUE

16.     This court has original jurisdiction of this civil action as one arising under the laws of the United States. *See* 28 U.S.C. §1331. This Court has jurisdiction over the subject matter of this civil action pursuant to Age Discrimination in Employment Act of 1967, 29 U.S.C. §621 *et seq*., Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, *et. seq*., and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq*.

17.     The causes of action arise under the ADEA; Title VII; 42 U.S.C. § 1981a; and the

ADA.

18.     Venue is proper in this Court under 28 U.S.C. §1391(b) as Defendant is

incorporated in this District, its corporate headquarters is in this District, and it is a resident of this

District.

19.     Venue is also proper in this Court under Title VII through 42 U.S.C. § 2000e-5(f)(3)

because the pattern, practice, and policy of discrimination originated and was implemented in this

District.   In the alternative, the records pertaining to the underlying discrimination are located

within this District.

## **PARTIES**

**A.  Plaintiffs**

20.     Plaintiff Robert Wilhoit worked for AstraZeneca for 24 years and 5 months and

resides in Greensboro, North Carolina. Wilhoit requested a religious accommodation to the

Mandate, but AstraZeneca pretextually denied that request and then terminated him on April 29,

2022, despite his natural immunity.   On the date of his termination, Wilhoit was 61 years old,

worked as an Executive Diabetes Sales Specialist, and possessed an exceptional performance

record.   Wilhoit's replacement, Lindsey Downing, is 38 years old.   As a result of Wilhoit's

termination and replacement with a substantially younger employee, the average age of the

workforce decreased.  Additionally, in July of 2021, Wilhoit applied for a job he was well-qualified

for, but the position was given to a 23-year-old candidate who had no pharmaceutical experience.

On October 5, 2022, Wilhoit filed a charge of discrimination with the U.S. Equal Employment

Opportunity Commission ("**EEOC**") against AstraZeneca, providing notice of his intent to pursue

class action litigation for himself and those similarly situated.

21.     Plaintiff Christina Hargrove worked for AstraZeneca for over 9 years and resides in Orlando, Florida. Hargrove is 46 years old and for years worked in AstraZeneca's Orlando, Florida territory.  Hargrove submitted both a medical and religious accommodation request, but only her medical exemption was granted.  Most, if not all, of AstraZeneca's Florida based employees who requested exemption from the Mandate were granted an exemption.  On January 1, 2021, AstraZeneca transferred Hargrove to the Clermont, Florida territory.  This transfer had a substantial impact on her work-life balance as she was forced to commute 60-to-90 minutes a day from her home in Orlando.  In December of 2021, a position in the Orlando territory opened. Hargrove applied but was rejected for the job, despite her exceptional performance record, previous experience in that territory, and substantial sales contacts in and around Orlando.   After rejecting Hargrove, AstraZeneca filled the position with a woman in her early 30's named Maria Borja, a schoolteacher with no pharmaceutical or sales experience.  After observing extensive age-based discrimination, and experiencing the same, Hargrove resigned in July 2022 under protest due to intolerable work conditions that would cause any reasonable employee in her shoes to resign.  Her position was backfilled by Marie Moore, who is in her early thirties.  Hargrove filed a charge of discrimination with the EEOC on December 14, 2022, providing notice of her intent to pursue class action litigation for herself and those similarly situated.

22.     Plaintiff Giji Mischel Dennard worked for AstraZeneca for over 4 years and resides in Burtonsville, Maryland.  Dennard requested religious accommodation to the Mandate, but AstraZeneca pretextually denied that request and then terminated her on April 29, 2022, despite her natural immunity.  At the time of her termination, Dennard was 60 years old and worked as the Associate Director for Strategic Business Operations of External Research and Development

within Oncology Research and Development department.  Due to her high productivity, Dennard received several promotions during her tenure.  After AstraZeneca terminated her, Dennard's role was eliminated, her duties were redistributed to Patricia Casbas-Hernandez (in her 30's), Sandra Macaskill (40's), Sarosh Effendi (40's), and Marsha Tonkins (40's or early 50's).  Because of Dennard's termination, the average age of AstraZeneca's workforce decreased.  Dennard filed a charge of discrimination with the EEOC on December 23, 2022, providing notice of her intent to pursue class action litigation for herself and those similarly situated.

23.     Plaintiff Julie Magers worked for AstraZeneca for 12 years and resides in Medina, Ohio.  Magers requested religious accommodation to the Mandate, but AstraZeneca pretextually denied that request and then terminated her on April 29, 2022, despite her natural immunity.  At the time of her termination, Magers was 45 years old and worked as a Diabetes Pharmaceutical Sales Representative and possessed an exceptional performance record.  Magers' replacement at AstraZeneca was approximately 39 years old.  As a result of Mager's unlawful termination and replacement with a younger employee, the average age of AstraZeneca's workforce decreased.  On August 18, 2022, Magers filed a charge of discrimination with the EEOC, providing notice of her intent to pursue class action litigation for herself and those similarly situated.  The EEOC issued Magers a Notice of Right to Sue on September 28, 2022.

24.     Plaintiff Megan Small worked for AstraZeneca for over 22 years as a Pharmaceutical Sales Representative and resides in Venetia, Pennsylvania.  Small requested a religious accommodation to the Mandate, but AstraZeneca pretextually denied that request and then terminated her on April 29, 2022.   At the time of her termination, Small was 46 years old. As part of its ongoing effort to lower the average age of the workforce, AstraZeneca hired Lyndsi

Yarkosky (approximately 36) in January 2022.  Older, more experienced applicants were passed over for this role.  After Small's unlawful termination, her position was not backfilled and many of her job duties were transitioned to Yarkosky, resulting in a net decrease in the number of employees 40 and older on Small's team and further lowering the average age of AstraZeneca's workforce.  On August 23, 2022, Small filed a charge of discrimination with the EEOC against AstraZeneca, providing notice of her intent to pursue class action litigation for herself and those similarly situated.

25.     Plaintiff Regina Rusgrove worked for AstraZeneca for 8 years and 7 months and resides in Savannah, Georgia.  Rusgrove timely filed a request for religious accommodation to the Mandate, but AstraZeneca pretextually denied that request and then terminated her on April 29, 2022.  When she was terminated, Rusgrove was 51 years old, worked as a Senior Professional Sales Specialist, and possessed an exceptional performance record.  Rusgrove was replaced by an internal transfer who is of a similar age to Rusgrove but on belief, the transfer's position has not been filled, resulting in a net decrease in the number of AstraZeneca employees under 40.   On August 19, 2022, Rusgrove filed a charge of discrimination with the EEOC against AstraZeneca, providing notice of her intent to pursue class action litigation for herself and those similarly situated.  Rusgrove received a Notice of Right to Sue on December 8, 2022.

26.     Plaintiff Lisa Marshall worked for AstraZeneca for 8 years and 10 months in and around Cleveland, Ohio as a Pharmaceutical Sales Specialist in the Cardiovascular Specialty Division. Marshall requested religious accommodation to the Mandate, but AstraZeneca pretextually denied that request and then terminated her on April 29, 2022, despite her natural immunity.  Marshall's religious exemption request, and the subsequent accommodations process,

is a prototype of AstraZeneca's pattern and practice of religious discrimination.  When she was terminated, Marshall was 44 years old.  It is unclear the age of the employee who replaced Marshall, or, if that employee as an internal transfer, whether that person was substantially younger.  Marshall filed a charge of discrimination with the EEOC, providing notice of her intent to pursue class action litigation for herself and those similarly situated.  Marshall received a Notice of Right to Sue on September 28, 2022.

**B.  Defendant**

27.     Defendant AstraZeneca Pharmaceuticals LP is incorporated under the laws of the State of Delaware and has its principal place of business located at 1800 Concord Pike, Wilmington, DE 19850.

## CONDITIONS PRECEDENT

28.     Multiple plaintiffs filed charges of discrimination with the EEOC alleging class wide discrimination under Title VII, and the ADA and received a Notice of Right to Sue. Additionally, multiple plaintiffs filed timely charges with the EEOC indicating their intention to file a representative action relating to AstraZeneca's age discrimination and it has been more that 60 days since these plaintiffs filed age-based class claims.

## BACKGROUND AND FACTUAL ALLEGATIONS

**A.  AstraZeneca's Stated Policy to Cultivate a Younger Workforce**

29.     In or around March of 2021, Mike Hartman, the U.S. Director of Sales, stated in a nationwide sales presentation that the average employee age of AstraZeneca was "too high" being at around 48, and indicated that the average age needed to be closer to 29.

30.     Normally, presentation slides are available for employees to access and view on AstraZeneca's shared network.  However, soon after the presentation concluded, these slides were unavailable.

31.     On November 30, 2021, Arrastene ("EJ") Henry, the Head of Inclusion and Diversity at AstraZeneca at that time, echoed Hartman's statements.  In a region-wide presentation, Henry emphasized that AstraZeneca would be working towards increasing the company's percentage of employees under the age of 30.

32.     These corporate policies have been embraced by lower-level managers throughout the country, who acted on AstraZeneca's stated policy to cultivate a younger workforce.

## B. AstraZeneca's Culture of Age Discrimination and Active Steps Towards Lowering the Average Age of its Workforce

33.     Since at least 2018, AstraZeneca cultivated a corporate policy, conceived and driven from the highest levels of the company, that emphasizes the values of youth and discards the contributions and strengths of older employees.  Top-down policies of preferencing younger employees at the expense of older employees permeated the company's culture and manifested with real world (and unlawful) outcomes at the local level.  Over the past four years, the company executed several reductions in force, where older employees were disproportionately targeted for elimination.

34.     Further, hiring managers throughout the country acted on the corporate policy of lowering the average age of the workforce.  These managers frequently chose younger, less experienced candidates over candidates with decades of industry experience.  Long-term AstraZeneca employees over the age of 40, on the other hand, found themselves transferred into

undesirable markets, or passed over for otherwise deserved opportunities, which were given to younger, less experienced candidates.

35.     For example, in 2021, Plaintiff Wilhoit applied for an open position in North Carolina to be closer to his family.  With 24 plus years' experience in pharmaceutical sales and an exceptional performance record, Wilhoit was well qualified and was confident he would be selected for the position.   He was 60 years old at this time and was rejected for the position. Instead, AstraZeneca hired a 23-year-old woman who had no pharmaceutical experience to fill the position that Wilhoit sought.  After he was fired for declining a COVID-19 vaccine due to his religious beliefs, Wilhoit's position was backfilled by a 38-year-old woman.

36.     Plaintiff Julie Magers experienced and observed significant acts of age discrimination in Ohio.   Magers' manager Adrian Segedy passed over very experienced candidates who were over the age of 40, and hired an inexperienced candidate, Casey Bulmer (26 years old), who was interviewed by multiple members of Magers' team.   The consensus was that Bulmer was not qualified for the position.  Numerous members of Magers' team recommended against hiring Bulmer because of his lack of experience and because of the high quality of other candidates.  For example, Brain Maher, age 47, applied and was more qualified than Bulmer; Tom Flood, age 46, applied and was more qualified; and Michael Harris, in his late 40's, applied and was more qualified.  Nonetheless, Bulmer was hired, notwithstanding his lack of qualifications. On other occasions, Magers' overheard her manager, Segedy, express his intention to hire younger employees because of their age.  Segedy's pattern of conduct was a local manifestation of the overarching corporate policy to cultivate a younger workforce.

37.     Magers also experienced age discrimination firsthand through the religious accommodation process.  During the process, a younger employee who did not actually possess religious objection to compulsory vaccination was treated more favorably than Magers.  It is Magers' understanding that Segedy personally assisted a younger female employee named Sarah Argentine (age 35) to carefully craft her religious exemption request.  This was after Argentine had made it clear that she was not particularly religious but was just hesitant to take a COVID-19 vaccine.  In ensuring Argentine's exemption was carefully crafted and eligible for a reasonable accommodation, Segedy was acting under AstraZeneca's corporate policy to cultivate and maintain a younger workforce.  After her accommodation request was denied, Magers spoke with colleague, Heather Snyder, who expressed shock that Argentine was accommodated and that Magers was not because Argentine is not religious and rarely if ever attends church, while Magers attends religious services weekly and clearly possessed religious based objections to vaccination, while Argentine clearly did not.

38.     Before she was terminated, Magers raised her concerns about Segedy helping Argentine with her religious exemption to the corporate HR Department, along with other concerns about Segedy's managerial actions.  After she was terminated, AstraZeneca e-mailed Magers on June 27, 2022, advised that an investigation had occurred, and informed that AstraZeneca had determined some of Magers' allegations were substantiated.

39.     Magers refused to sacrifice her religious beliefs in exchange for keeping her job and was terminated, while Argentine, who held a similar job, was given a religious accommodation.  Magers was then replaced with a significantly younger employee.

40.     Plaintiff Small experienced and observed similar age discrimination in Pennsylvania.  In or around December of 2018, AstraZeneca executed a significant layoff within Small's department where most all employees who were let go were in their late 40's and older, with the exception of one younger employee.  In or around November of 2021, Small's manager, Holly DiPietro, hired a candidate who was in her 30's who had little sales experience and rejected a very qualified candidate, Frank Baker, who was in his 50's and possessed significant sales experience.  Consistent with Hartman's statements, Small believes her manager was pressured by upper management to prioritize hiring a younger candidate for the position.  During her tenure, Small served as her team's Inclusion and Diversity liaison for two years.  As liaison, Small participated in several conference calls and presentations by the AstraZeneca Diversity and Inclusion Team centered on "bridging the gap between the ages" in their hiring practices. These presentations began in late 2018 when AstraZeneca laid off a significant number of older employees.  After firing Small, AstraZeneca did not backfill Small's job, but many of her responsibilities were shifted to an employee who was approximately 36-years-old.

41.     In Florida, Plaintiff Christina Hargrove was passed over for a position for which she was well qualified, and AstraZeneca instead selected substantially younger candidate who had no relevant experience.  This particular position was in Orlando, which is notable because Hargrove had established strong connections in and around the Orlando area and had successfully worked in that district for a number of years.  On January 1, 2021, after a significant reduction in force on her team, Hargrove's sales territory was transferred to the Clermont, Florida region, which required a significant commute (a complication that was exacerbated by her having a newborn child).

42.     In December of 2021, a new position opened in the Orlando territory.  Based on her strong performance record, including the time in which she serviced the Orlando territory, and considering her substantial sales connections in and around Orlando, Hargrove was confident she would be selected for the position.  However, a substantially younger candidate named Maria Borja was selected for the position.  Borja is in her early 30's.  In contrast to Hargrove's resume, Borja was a schoolteacher who had no experience in pharmaceutical sales.

43.     After being passed over for a job that was filled by a younger, less-qualified candidate, observing a comprehensive shift towards younger employees, and witnessing a mass termination of AstraZeneca's older employees through the Mandate, Hargrove realized that her options for promotion or transfer opportunities were non-existent.  Considering these factors, and in light of AstraZeneca's unwillingness to allow her to transfer back into the Orlando sales region, Hargrove resigned under protest due to intolerable work conditions on July 19, 2022.  Hargrove's position was ultimately backfilled by Marie Moore, who is in her early thirties.

44.     Likewise, in Maryland, Plaintiff Dennard personally experienced age discrimination.  After AstraZeneca terminated Dennard for non-compliance with the Mandate, Dennard's role was eliminated, and her duties were reallocated to employees who were significantly younger.

45.     In Ohio, Plaintiff Marshall witnessed age discrimination, particularly in the Cardiovascular department where she worked.  Fortunately, Marshall survived a large reduction in force in November of 2021, where approximately 80-90% of the terminated employees were over the age of 40.  Like the other plaintiffs across the country, Marshall also observed the corporate shift towards younger employees, and was nervous that she would eventually meet the

16

same fate as her colleagues that were eliminated through the 2021 RIF.  Marshall was terminated a couple months later after holding true to her religious convictions that conflicted with the Mandate.

### C. The COVID-19 Pandemic and AstraZeneca's Initial Response

46.     Beginning in March 2020, the SARS-CoV-2 virus spread globally, resulting in worldwide emergency countermeasures to mitigate the spread of the disease now known as COVID-19.

47.     AstraZeneca initially responded through requiring its "non-essential" employees to work from home.   However, AstraZeneca soon thereafter prioritized profits over the safety of its workforce.  As early as June 2020, during the height of the pandemic, AstraZeneca sent sales teams back into the field, providing only paper masks and hand sanitizer as the safety protocol.  This was in stark contrast to most other companies in the pharmaceutical sales industry, who continued their remote work policies throughout 2020 and 2021.  Many companies continue to observe enhanced safety protocols today.

48.     In September of 2021, AstraZeneca imposed asymmetric safety protocols, requiring only those employees who were unvaccinated to test weekly for COVID-19.  When it imposed this policy, AstraZeneca knew or should have known through its internal tracking data and publicly available information that its vaccinated employees were contracting COVID-19 at similar or even higher rates than its unvaccinated employees (particularly those who possessed natural immunity).

49.     Throughout 2021, AstraZeneca represented to its employees that it would respect their choice on whether to become vaccinated for COVID-19.  Beginning in the Fall of 2021,

employees were required to upload their vaccination status to a company portal. Thus, through that process, AstraZeneca knew exactly how many employees were and were not vaccinated. Through other administrative records, AstraZeneca would have also known prior to instituting the Mandate the specific age of each unvaccinated employee, as well as the average age of its unvaccinated workforce.

50.     A study conducted by the Pew Research Center showed that younger Americans (18-29) are significantly less likely to view religion as "very important" in life and are less likely than those aged 40 and over to rely on religion as their guidepost for 'right and wrong'. *See* PEW RESEARCH CENTER, *Religious Landscape Study,* https://www.pewresearch.org/religion/religious-landscape-study/age-distribution/ (study of the American religious landscape based on telephone interviews with more than 35,000 Americans from all 50 states). Older employees are also significantly more likely to possess medical conditions that would preclude them from receiving a COVID-19 vaccine.

### D. AstraZeneca's Vaccination Mandate, Obstinate Disregard of Vaccine Inefficacy, and Weaponized Accommodations Process

51.     On or about January 31, 2022, after learning the number and average age of its unvaccinated workforce, AstraZeneca reversed course on its representations that it would respect employees' choices on whether to be vaccinated and imposed a COVID-19 vaccination mandate on its entire U.S. based workforce. The Mandate set February 28, 2022, as the date for any religious or medical exemption requests.

52.     At this time, it was abundantly clear that the available COVID-19 vaccines were ineffective at preventing infection and transmission of COVID-19, as AstraZeneca's own internal tracking data will reveal.

53.     As early as August 2021, the CDC recognized that the COVID-19 vaccines worked "with regard to severe illness and death—they prevent it.  But what they can't do anymore is prevent transmission."  Statement by Rochelle Walensky, U.S. Centers for Disease Control, CNN Interview (Aug. 5, 2021).  Notably, the CDC itself never had an absolute vaccination policy in place and terminated no unvaccinated employees, even ones without medical or religious reasons not to take the vaccine.

54.     By January of 2022, it was also abundantly clear that natural immunity was at least equivalent to vaccine-based immunity.  In fact, it was apparent by then that vaccine efficacy significantly wanes over time, and it was known that the odds of an infection for individuals only vaccinated with a primary series was 13 times greater than for individuals with natural immunity. Sivan Gazit, *et al.*, *Comparing SARS-CoV-2 natural immunity to vaccine-induced immunity: reinfections versus breakthrough infections*, MEDRXIV [preprint] (Aug. 25, 2021), https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.

55.     The strength of natural immunity has been observed and carefully documented through hundreds of years of research and has been universally accepted as at least equivalent to immunity derived from vaccination.  *See Plotkin's Vaccines*, 7th Edition, at Section 2.  This should be unsurprising given that vaccine-based immunization is but an artificial attempt to emulate the mechanisms of natural immunity.

56.     Soon after instituting the Mandate, many AstraZeneca employees questioned why vaccine-based immunization was the absolute, without exception priority, considering that they had been immunized naturally.  AstraZeneca refused to engage these valid questions.

57.     Despite strong evidence of vaccine inefficacy and the relative strength of natural immunity, AstraZeneca persisted with implementing its vaccine mandate on all unvaccinated employees.  This was at a time that AstraZeneca's vaccinated employees were contracting and spreading COVID-19 at high rates, but, nonetheless, AstraZeneca did not place any enhanced safety protocols on its unvaccinated employees.

58.     Consistent with Title VII and ADA requirements, AstraZeneca provided instructions on obtaining religious and medical exemptions from the mandate.  Exemption requests had to be submitted by February 28, 2022.

59.     Religious        exemption        requests        were        to        be        sent        to USVaccineExemptions@astrazeneca.com via the Religious Reasonable Accommodation Request Form (the "**Form**"), answering the following questions:

> Please describe the nature of your objection(s) to the Company's COVID-19 vaccination requirement.
>
> How long have you held the religious belief underlying your objection? What is the name of your religion and are you a member of a place of worship (church, synagogue, mosque, etc.)?
>
> Please explain how the religious belief that prevents you from receiving the COVID-19 vaccine affects other areas of your life. For example, have you received other vaccines in the past? If so, please explain how your religious belief prevents you from getting the COVID-19 vaccine but not other vaccines.
>
> Have you ever requested a religious accommodation previously, either on your own behalf or on behalf of a family member, such as a child who was subject to a school's vaccination requirements? If yes, please describe.
>
> Please attach any supporting documentation that may be helpful in evaluating this request for accommodation, this may include a website with information on your religious beliefs or practices, or a letter from a religious leader describing your specific religious

beliefs and/or the tenets of the religion that limits or restricts you from being vaccinated. If submitting a letter from a pastor, please also describe how long you have known this individual.

60.     Approximately two weeks after the submission deadline, AstraZeneca sent the majority of those who had requested religious accommodation a set of secondary questions ("**secondary questions**").  In the standard secondary question form, AstraZeneca stated in the preface that the "Company has carefully evaluated your request and has determined that additional information is necessary in order for the Company to arrive at an informed and final decision." However, the content of the secondary questions made it obvious that AstraZeneca was not individually assessing each request, but rather was utilizing an automated checklist or some type of computer assisted technology that focused on keywords, generating secondary questions based on certain phrases like "abortion", "fetal cells", "Holy Spirit", "Christian", "church", and "Catholic."

61.     On information and belief, the autogenerated secondary questions focused primarily on Judeo-Christian belief systems.  Consequently, because of these pre-formatted secondary inquiries, employees from non-Judeo-Christian belief systems were significantly less likely to be subjected to a religious inquisition regarding the sincerity or religious nature of their beliefs.

62.     In many cases, it was apparent that the initial request had not been individually reviewed by a person.  Often, the underlying request already provided the answer to the question presented by the secondary questions.  Or in other instances, the secondary question was completely illogical relative to the underlying request.

63.     For example, Plaintiff Rusgrove's religious exemption was based on the conviction against vaccination she received after seeking guidance from the Holy Spirit.   Rusgrove is Christian and regularly seeks guidance from the Holy Spirit, but did not mention anything about keeping her body pure or about her body being a ***temple*** of the Holy Spirit.

64.     A common religious objection to COVID-19 vaccination is based on the Bible's command to protect and preserve one's body, based on 1 Corinthians 6:19-20, which states "do you not know that your body is a ***temple of the Holy Spirit*** within you, whom you have from God? You are not your own, for you were bought with a price.  So glorify God in your body." (Emphasis added).   Rusgrove's request was ***not*** in any way based on this common objection, but AstraZeneca's canned response indicates that its impersonal review or computer assisted technology mistakenly believed her request was based on 1 Corinthians 6:19-20's command to keep one's body pure, and then robotically attempted to undermine her beliefs.

65.     Rusgrove received a standardized follow-up question that stated:

> [y]our request mentions that you cannot get vaccinated because of your beliefs that your body is a temple and you are prohibited from putting harmful substances into your body. To help us understand your religious beliefs better, can you confirm whether, for the period while you have held these religious beliefs, you have smoked cigarettes, consumed alcohol, received any tattoos or used any legal recreational drugs?

66.     Rusgrove responded that "[m]y original exemption request did not mention the above statement as you have implied."  AstraZeneca did not clarify its mistake and did not follow-up with Rusgrove for clarification on her underlying request.   Nevertheless, AstraZeneca then terminated Rusgrove on grounds that she "was not qualified" for an accommodation.

67.     Likewise, plaintiff Marshall received a list of secondary questions that appeared to be autogenerated and devoid of any individualized review.   Several questions were either redundant (already answered in Marshall's initial request) or appeared to be generated by phrases cited by Marshall, but illogical relative to the actual substance of her underlying request. For example, one of the follow-up questions robotically stated:

> [y]our request mentions that you cannot get vaccinated because of your beliefs that your body is a temple and you are prohibited from putting harmful substances into your body. To help us understand your religious beliefs better, can you confirm whether, for the period while you have held these religious beliefs, you have smoked cigarettes, consumed alcohol, received any tattoos or used any legal recreational drugs? If yes, please describe why these activities do not violate your religious belief that your body should not be subjected to anything that may harm it.

68.     Marshall's initial request, however, did not state that she was precluded from receiving a vaccine based on a concern that she could not place harmful substances into her body. Rather, her request stated  "[m]y body is a temple of the Trinity - God the Father, God the Son and God the Holy Spirit.  I have prayed for the will of God in this matter and it is His will that I do not receive the vaccine. I cannot knowingly and freely take a vaccine that has used aborted fetal cells either in testing or production."

69.     Like Plaintiff Rusgrove, Marshall based her religious objections to receiving a COVID-19 vaccine on guidance from the Holy Spirit, and on her objections to abortion.  She received the exact same follow-up question as Rusgrove, and in both cases the follow-up question was entirely illogical relative to the underlying request.

70.     The concept of using a computer-generated algorithm to evaluate accommodation requests is not unique to AstraZeneca.   Recently, it was revealed that the United States Coast

Guard was utilizing automated processing software that lacked individualized assessment to deny religious exemption requests to its COVID-19 vaccination requirement.[1]  On belief, considering the examples outlined above, AstraZeneca utilized a similar process.

71.    Because they were deployed uniformly across the board, the robotic follow-up questioning scheme was conceived at the highest levels of the company.  AstraZeneca's strategy for selectively denying certain religious exemption requests, based on an automated process or on underlying computer assisted technology devoid of individualized assessment, was a corporate decision.

72.     AstraZeneca also granted and denied accommodations in an illogical fashion, further demonstrating pretext and lack of individualized assessment.  For example, Plaintiff Small and her close friend Nancy DiCenso both have religious objections to receiving a COVID-19 vaccine.  Small and DiCenso work in the same Pennsylvania territory.  They thought through the issues together, arrived at analogous conclusions, and submitted religious exemption requests that were very similar.  Small was denied.  DiCenso was accommodated, further revealing that individualized reviews did not occur.  This action will reveal many similar instances, where employees who submitted virtually identical exemption requests were met with polar opposite outcomes.

73.    After submitting responses to the secondary questions, employees seeking religious accommodation were never afforded the opportunity to discuss possible accommodation options

---

[1] *See* Fox News, October 18, 2022, *Coast Guard used 'Digital Tool' to More Efficiently Deny Religious Vax Exemptions, available at* https://www.foxnews.com/politics/coast-guard-digital-tool-efficiently-mass-deny-religious-vax-exemptions-republicans-allege

based on their individual circumstances.  Moreover, there was no direct interaction between plaintiffs and the individual(s) who oversaw the accommodations process. The entire process remained shielded behind an anonymous email address, devoid of any personal communication or individualized interaction specific to each request.  Notably, AstraZeneca's General Counsel, Jeff Pott, assumed additional responsibilities as the Chief of Human Resources in January of 2021.  On belief, Mr. Pott oversaw critical elements of the religious accommodations process.

74.     AstraZeneca communicated its denials to Plaintiffs and those similarly situated on or about March 31, 2022.

75.     Like the secondary questions, the denial letters lacked any type of individualized assessment.  In the denial letters, which were identical, AstraZeneca emphasized the undue hardship that may result from accommodating unvaccinated employees (even though the company accommodated large portions of employees who sought accommodation, and in jobs substantially equivalent to Plaintiffs' jobs).  In highlighted blue font, AstraZeneca instructed that undue hardship "can include, but is not limited to, business disruption/increased costs resulting from illness-related absences."  AstraZeneca's specific concern that Plaintiffs' vaccination status would endanger profits was consistent with the company's prior communications when it initially instituted the Mandate.  In a corporate-wide e-mail in January of 2022, AstraZeneca justified the Mandate on grounds that data had shown that "vaccination is highly effective at preventing serious illness and death."  However, AstraZeneca did not require vaccination for many of its employees outside of the United States, and accommodated most, if not all, of its employees in select number of states.

76.     After stating that employees were "not qualified" for an accommodation, the form denial letters instructed that their employment would be terminated on April 22, 2022 "without

severance."   This   implies   that   AstraZeneca   classified   the   mass   terminations   as misconduct/insubordination per AstraZeneca's standard separation plan.

77.    After denying Plaintiffs requests for accommodation, AstraZeneca attempted to strong-arm its religious employees into compliance by refusing to issue employees' Q1 bonuses unless they chose to "voluntarily" resign from their position and sign legal releases, rather than wait to be terminated on April 29, 2022.   The work performed by plaintiffs who were sales representatives during Q1 spanned from January 1, 2022, through March 31, 2022.   Quarterly bonuses for sales representatives were based on pre-determined performance metrics. Despite earning their respective bonuses during the relevant time, AstraZeneca refused to distribute bonuses unless employees voluntarily resigned and signed a legal releasee.

78.    Suspiciously, in December 2021, just weeks before instituting the Mandate, AstraZeneca quietly changed its separation agreement policy regarding bonus distribution and entitlement to certain benefits.  Prior to these changes, it was common practice that if an employee worked for an entire quarter and later separated from the company, sales representatives would still be entitled to the bonus for that quarter.  This was AstraZeneca's policy for many years and was well understood by most plaintiffs.

79.    On information and belief, many AstraZeneca employees resigned under duress, rather than be formally terminated, because they otherwise would have lost out on thousands of dollars of earned income or would otherwise surrender substantial retirement benefits.

80.    AstraZeneca's workplace safety rationale makes no sense considering that it accommodated a large number of its unvaccinated employees across the country.  To the extent AstraZeneca had employees working in these states, AstraZeneca accommodated most, if not all,

of its employees who worked in Florida, Texas, Alabama, Arizona, Indiana, Kansas, Mississippi, Montana, Nebraska, North Dakota, South Carolina, Tennessee, Utah, and West Virginia.

81.     AstraZeneca terminated those denied religious accommodation despite knowing those employees posed no greater risk to the workforce than their vaccinated colleagues, particularly unvaccinated employees who possessed natural immunity. As an international pharmaceutical company, AstraZeneca knew or should have known that centuries of research have established that natural immunity from disease provides equal or greater protection than vaccination.

82.     Further, when the mass termination occurred on April 29, 2022, it was abundantly clear that the available COVID-19 vaccines were highly ineffective at preventing infection or transmission.  Moreover, while the safety of the available vaccines was arguably unclear in the Fall of 2021, AstraZeneca also knew or should have known that the available vaccines were not safe under any objective measurement in April of 2022 when it executed the mass termination.

**E. Period Between Accommodation Denials and the Mass Termination and AstraZeneca's Refusal to Recognize Natural Immunity**

83.     On April 19, 2022, a Cease-and-Desist Letter was sent to AstraZeneca from the Siri and Glimstad law firm outlining how AstraZeneca's accommodations process violated Title VII.

84.     The Letter also emphasized the current scientific realities and the irrationality of terminating highly productive employees based on vaccines that, by that date, were proven to be ineffective:

> The reasonableness of terminating any AstraZeneca employee on grounds of undue hardship will be evaluated through the lens of the scientific realities that exist on April 22, 2022, not what may have been generally accepted at the time AstraZeneca announced its compulsory vaccination policy. What AstraZeneca may have argued

27

was a valid reason for denying an accommodation based on undue hardship last year, or even last month, simply is not a legitimate, lawful justification today. At present, it is an undisputed scientific fact that AstraZeneca's vaccinated employees can contract and transmit COVID-19. The compulsory vaccination policy, consequently, is now irrational and contrary to science. In fact, scientific data demonstrates that vaccinated individuals are contracting and spreading the virus at equal or even higher rates than the unvaccinated.

85.     The Letter also highlighted the absurdity of terminating *any* employee (irrespective of their religious or medical objections) who possessed natural immunity:

The overwhelming majority of AstraZeneca employees who have contacted our firm possess natural immunity. It is widely accepted that natural immunity is at least equivalent to vaccine-elicited immunity. For example, as early as the Fall of 2021, natural immunity was exhibiting a more robust and durable immune response than vaccine-elicited immunity. The relative strength of natural immunity has been re-confirmed by studies from across the globe, demonstrating that infection rates for the dominant Omicron variant amongst the vaccinated are higher than the infection rates for those with natural immunity.

86.     Nonetheless, unwilling to surrender its opportunity to accomplish its goal of lowering the average age of the workforce, AstraZeneca persisted with its irrational and unlawful mass termination scheme.  AstraZeneca fired more than 200 unvaccinated employees on April 29, 2022, the overwhelming majority of whom were either over the age of 40 or possessed religious objections to compulsory vaccination.

**F.  Plaintiffs**

**<u>Robert Wilhoit</u>**

87.     Wilhoit was born in 1961.  He is currently 62 years old and was 61 years old when AstraZeneca terminated his employment.  During his tenure, Wilhoit worked as an Executive Diabetes Sales Specialist and possessed a very good performance record, ranking in the top 30%

of the company for sales. After terminating Wilhoit, AstraZeneca backfilled his position with a 38-year-old employee.  Thus, as a consequence of Wilhoit's termination, the average age of AstraZeneca's workforce decreased.

88.     Additionally, in July 2021, before he was terminated, Wilhoit applied for an internal transfer to a new division to be closer to family in North Carolina. Despite having over 24 years' experience at AstraZeneca and being a high performer, Wilhoit was passed over for the job. Instead, AstraZeneca selected a 23-year-old with very little experience in the industry for the North Carolina job.  Wilhoit remembers AstraZeneca's head of National Sales, Mike Hartman, stating on presentations that AstraZeneca had an aging workforce and that the company needed to compensate for that reality by acquiring younger sales representatives.  Wilhoit also recalls a presentation by EJ Henry, AstraZeneca's head of Diversity and Inclusion, where Mr. Henry emphasized that AstraZeneca was lacking in younger employees and needed to do better in that regard.  At the conclusion of these presentations, Wilhoit felt, because of his age, that his job was in jeopardy.

89.     At the time of his termination, Wilhoit possessed natural immunity to COVID-19 and had laboratory proof of active antibodies.  Thus, AstraZeneca's insistence that he discard his religious convictions and become immunized artificially and was altogether unnecessary.  Many AstraZeneca employees requested that their natural immunity be recognized as satisfying AstraZeneca's immunization requirements, and all such requests were either flatly rejected or were ignored.

90.     Beginning in September 2021, Wilhoit was required to submit weekly COVID-19 PCR tests based solely on his vaccination status (despite his documented natural immunity).

Vaccinated employees were not subject to this requirement. Consequently, before instituting the Mandate, AstraZeneca knew Wilhoit was unvaccinated and also obviously knew at this time that he was over the age of 40.

91.     Because he holds sincerely held religious beliefs that preclude him from receiving a COVID-19 vaccine, Wilhoit submitted a religious accommodation request to be exempt from the Mandate.

92.     Wilhoit's accommodation request contained an explanation of his sincere religious beliefs that conflicted with the Mandate.  Wilhoit prays and seeks guidance from the Holy Spirit for major life decisions.  After thoughtful prayer, Wilhoit came under spiritual conviction that he must not receive any of the available COVID-19 vaccines.

93.     In response to his submission, AstraZeneca sent the standard follow-up questions, which came as a surprise.  Wilhoit's original submission sufficiently provided information to substantiate the conflict with his religious beliefs, as well as the sincerity of his beliefs.  In fact, Wilhoit lost his job to maintain his spiritual convictions, confirming the intensity and sincerity of his beliefs.

94.     Other employees, including younger employees, who, like Wilhoit, submitted requests basing their objections on prayer and guidance from the Holy Spirit were provided religious accommodations.

95.     On March 31, 2022, Wilhoit received the form denial of his request for religious accommodation that stated he was "not qualified for a reasonable accommodation."  The denial also stated that Wilhoit had until April 22, 2022, to become vaccinated, or face termination on

April 29, 2022.  AstraZeneca also instructed Wilhoit that he would receive no severance if he remained unvaccinated.

96.     Wilhoit was never personally contacted by a member of the accommodation review panel.  No person sought to clarify the sincerity or religious nature of his religious beliefs.  When denying Wilhoit's request, AstraZeneca also did not challenge the sincerity or religious nature of his beliefs that conflicted with Mandate, but rather emphasized the potential undue hardship that accommodating him presented to the company.

97.     In its denial letter, AstraZeneca emphasized to Wilhoit the undue hardship that may result from accommodating him.  In highlighted blue font, AstraZeneca instructed that undue hardship "can include, but is not limited to, business disruption/increased costs resulting from illness-related absences."

98.     AstraZeneca provided no explanation specific to Wilhoit's individual circumstances as to why it would be an undue hardship to accommodate his request.  Upon information and belief, AstraZeneca accommodated many other employees, including younger employees, who held substantially similar roles to Wilhoit.

99.     In addition to providing the same religious accommodations it did to other similarly situated employees, AstraZeneca could have simply recognized his natural immunity as a no-cost accommodation option.  In fact, because of the documented strength of natural immunity, the Mandate should not have applied to Wilhoit in the first place.  AstraZeneca could have also accommodated Wilhoit with temporary remote work or enhanced safety protocols, like those Wilhoit had utilized throughout the height of the pandemic.  Wilhoit's job role could have been performed 100% remotely, as Wilhoit had done for substantial periods throughout the pandemic.

31

In fact, during the relevant timeframes, several AstraZeneca sales offices conducted their operations entirely over Zoom calls. There was never discussion with Wilhoit about remote work as a possible accommodation option, even if temporary until the pandemic threats subsided (and the threats had significantly subsided when Plaintiffs were terminated). AstraZeneca could have also permitted weekly testing for COVID-19 (which Wilhoit was willing to pay for and which is a more reliable indication of safety than vaccination).

100.    AstraZeneca terminated Wilhoit on April 29, 2022, classifying his termination as "for cause" which allowed AstraZeneca to avoid paying severance and other benefits to Wilhoit per company policy.

101.    As a result of AstraZeneca's actions, Wilhoit now makes significantly less per year, has decreased health benefits, and went from 6 weeks of paid vacation to none. Wilhoit was scheduled to receive approximately a $7,500 bonus based on work performed during Q1, from January through March 2022. Wilhoit never received the bonus.

102.    In addition to financial loss, Wilhoit suffered emotional and psychological harm from the months of uncertainty and repeated coercion to abandon his sincere religious beliefs in order to preserve his livelihood and career. As a result of the discriminatory treatment he experienced, he is suffering from emotional distress which is or has been marked by lack of focus and mental errors in everyday life; feelings of despondency; social anxiety; loss of interest in leisure activities; and feelings of agitation, and irritability.

## Giji Mischel Dennard

103.    Dennard was born in 1961. She is currently 61 years old and was 60 at the time AstraZeneca terminated her employment. During her tenure, Dennard worked as the Associate

Director of Strategic Business Operations for External Research and Development within the Oncology Research and Development department. Dennard possessed an exceptional performance record and had received two promotions during the pandemic due to her high productivity.

104. After AstraZeneca terminated her, Dennard's role was eliminated, and on information and belief, her duties were redistributed to Patricia Casbas-Hernandez (in her 30's) Marsha Tonkins (40's), Sandra Macaskill (40's), Sarosh Effendi (40's), and Marsha Tonkins (40's or early 50's). Thus, as a consequence of Dennard's termination, the average age of AstraZeneca's workforce decreased.

105. At the time of her termination, Dennard possessed natural immunity to COVID-19 and had laboratory proof of active antibodies. After her religious exemption was denied, Dennard reached out to her superiors and pleaded that AstraZeneca reconsider terminating her employment because she was not an increased risk to workplace safety due to her natural immunity. In fact, Dennard had spoken to a colleague, an AstraZeneca immunologist, who was emphatic that natural immunity provided strong protection against COVID-19. Thus, considering the established scientific reality and the company's actual knowledge of the strength of natural immunity, AstraZeneca's insistence that Dennard become immunized artificially and discard her religious convictions was altogether unnecessary. Dennard's request that her natural immunity be recognized was rejected.

106. Beginning in September 2021, Dennard was required to submit weekly COVID-19 PCR tests based solely on her vaccination status. Vaccinated employees were not subject to this

requirement.  Consequently, before instituting the Mandate, AstraZeneca knew Dennard was unvaccinated.  AstraZeneca also obviously knew at this time that she was over the age of 40.

107.    Because she holds sincerely held religious beliefs that preclude her from receiving a COVID-19 vaccine, Dennard submitted a religious accommodation request to be exempt from the Mandate.  Dennard's accommodation request contained an explanation of her sincere religious beliefs that conflicted with the Mandate.  Dennard cited her Christian practice of following all guidance given to her by the Holy Spirit.  Dennard emphasized that she had practiced living by the Holy Spirit's guidance for 38 years.  As an independent ground, Dennard emphasized her longstanding religious objection to abortion, and that, in her system of beliefs, her objection to abortion includes the COVID-19 vaccine's reliance on aborted fetal cell lines in testing and development.

108.    On information and belief, many employees, including younger employees, who submitted exemption requests based on objections to abortion and fetal cell involvement in vaccine development were granted accommodations, and the sincerity and religious nature of their beliefs were not challenged.  Likewise, many employees, including younger employees, who sought religious accommodation based due to guidance from the Holy Spirit that precluded them from receiving a COVID-19 vaccine were granted religious accommodations.

109.    On March 31, 2022, Dennard received the official denial of her request for religious accommodation that blankly stated she was "not qualified for a reasonable accommodation."  The denial also stated that Dennard had until April 22, 2022, to become vaccinated, or face termination on April 29, 2022, and that she would receive no severance if she chose to remain unvaccinated.

110.    Dennard was never personally contacted by a member of the accommodation review panel.  No person sought to clarify the sincerity or religious nature of her religious beliefs, although Dennard did reach out to her superiors asking for clarification and reconsideration after her accommodation request was denied.  In response, Dennard received a form letter that did not speak to the substance of her inquiries.

111.    When denying Dennard's accommodation request, AstraZeneca also did not challenge the sincerity or religious nature of her beliefs that conflicted with the Mandate, but rather emphasized the potential undue hardship that accommodating her presented to the company.

112.    Dennard's denial letter contained identical language to the denials sent to all other Plaintiffs.  In the denial letter, AstraZeneca emphasized the undue hardship that may result from accommodating Dennard.  In highlighted blue font, AstraZeneca instructed that undue hardship "can include, but is not limited to, business disruption/increased costs resulting from illness-related absences."

113.    However, AstraZeneca accommodated many employees, including younger employees, who held substantially similar roles to Dennard.

114.    Moreover, AstraZeneca could have simply recognized Dennard's natural immunity as a no-cost accommodation option.  At the time of her termination, Dennard possessed natural immunity to COVID-19.  Because of the documented strength of natural immunity, the Mandate should not have applied to her in the first place.   AstraZeneca forced Dennard to choose between her faith and continued employment, without credible justification.

115.    In addition to having natural immunity recognized as a no-cost accommodation option, AstraZeneca could have accommodated Dennard with the status quo of telework.

35

Throughout the pandemic, for approximately two years before she was terminated, Dennard had successfully teleworked. AstraZeneca could also have also granted the accommodation of weekly testing for COVID-19 (which is a more reliable indicator of infection than vaccination). Dennard communicated many of these options to her superiors, but she was dismissed outright.

116.    AstraZeneca terminated Dennard on April 29, 2022, classifying her termination as "for cause" which allowed AstraZeneca to avoid paying severance and other benefits to Dennard per company policy.

117.    As a result of AstraZeneca's actions, Dennard's finances have been significantly impacted. She is making significantly less money than she was with AstraZeneca and has been unable to pay for medical insurance.

118.    In addition to financial loss, Dennard suffered emotional and psychological harm from the months of uncertainty and repeated coercion to abandon her sincere religious beliefs in order to preserve her livelihood and career. As a result of the discriminatory treatment she experienced, she is suffering from emotional distress which is or has been marked by lack of focus and mental errors in everyday life; feelings of despondency; social anxiety; loss of interest in leisure activities; and feelings of agitation, and irritability.

**Christina Hargrove**

119.    Hargrove was born in 1976. She is currently 46 years old and was 45 when she was passed over for a job that was given to a substantially younger candidate.

120.    For nine years, Hargrove worked for AstraZeneca as a Senior Pharmaceutical Sales Specialist in the Orlando and Clermont, Florida territories. Beginning in 2019, Hargrove was

consistently ranked as a top performer in her region.  During the pandemic, despite the challenges presented, Hargrove continued to record exceptional sales numbers.

121.    In January of 2021, after surviving a RIF in her department, Hargrove was retained on her team but was reassigned from the Orlando territory (where she lives) to a territory a substantial distance from her home, in and around Clermont, Florida.

122.    At this time, Hargrove had a newborn infant, and this reassignment posed a major hardship on her and her family.  Clermont is a 60-to-90-minute commute from her home in Orlando.   Hargrove informed her manager Cortney Hooley of the strain the reassignment had caused to her and her family and asked Hooley to assist her with a transfer to a territory closer to home.  No efforts were made.

123.    In December of 2021, Hargrove's counterpart for the Orlando territory transferred to another location, and a position opened for her old role in Orlando.  Excited at the opportunity to work closer to home, Hargrove applied and interviewed on January 21, 2022.  Due to her past experience in Orlando, her performance record, and contacts in and around Orlando, Hargrove was confident she was the best candidate for the job.  However, AstraZeneca selected a 32-year-old schoolteacher who had no pharmaceutical experience.

124.    After realizing that her age was a major impediment and that she could no longer advance in the company, Hargrove resigned under protest on July 19, 2022.  Hargrove's position was then backfilled by a young woman in her early thirties named Marie Moore.

125.    As a result of AstraZeneca's discriminatory actions, Hargrove's finances have been negatively impacted.  She makes significantly less money now than she did as an AstraZeneca employee.   In addition to financial loss, due to the discrimination, Hargrove suffered emotional

and psychological harm which is or has been marked by lack of focus and mental errors in everyday life; feelings of despondency; social anxiety; loss of interest in leisure activities; and feelings of agitation, and irritability.

### Julie Magers

126.     Magers was born in 1976.  She is currently 46 years old and was 45 at the time AstraZeneca terminated her employment.  Shortly after terminating her, AstraZeneca replaced Magers with an employee aged 39, Eric Unruh, who is approximately 6 years younger than Magers.  Thus, because of Magers' termination, the average age of AstraZeneca's workforce was lowered.

127.     Beginning in September 2021, Magers was required to submit weekly COVID-19 PCR tests based solely on her vaccination status.  Vaccinated employees were not subject to this requirement.  Thus, before instituting the Mandate, AstraZeneca knew Magers was unvaccinated and that she was over the age of 40.

128.     Because she has sincerely held religious beliefs that preclude her from receiving a COVID-19 vaccine, Magers submitted a request for religious accommodation to the Mandate on February 20, 2022.  Her request outlined her sincere religious beliefs that she obeys the command of God, as relayed by the Ten Commandments.  Magers stated that if she received a vaccine she knew had come to market relying on aborted fetal cell lines, she would be participating and condoning the sin of abortion.  Magers articulated that this belief encompassed any vaccine that was tested on or developed using aborted fetal cell lines.  In her request, Magers emphasized these beliefs as those she held her entire life and that she regularly attends church services.

129.     Because she mentioned "fetal cells" in her exemption request, Magers received the standardized follow-up questions that most if not all other employees who presented objections relating to abortion and fetal cell research.

130.     The follow-up question stated:

> Your request references an objection to getting vaccinated because the available vaccines were tested on fetal cells that were derived from an aborted fetus. This process of testing pharmaceutical products is quite common. In fact, numerous regular over the counter products were also tested on similar cells as the COVID-19 vaccines, including Tylenol, Advil, Benadryl, Claritin, Pepto Bismol, Tums, Lipitor, Sudafed Zoloft, Prilosex OTC and others. Do you use any of these products? If so, please explain how using these products does not violate your religious beliefs.

131.     Magers responded to the question stating:

> I don't take any of these medications currently or have I in the past 5 years. Knowingly, I would never use a medication that uses aborted fetal cells. I have taken Ibuprofen years ago after a C-section. I never saw anything about the use of fetal cells. Ibuprofen has been around way before the use of fetal cells. If this is true I must confess at confession for the use of Ibuprofen. I again would never knowingly have taken it.

132.     Many employees, including younger employees, who submitted exemption requests based on objections to abortion and fetal cell involvement in vaccine development were granted accommodations, and the sincerity and religious nature of their beliefs were not challenged.

133.     On March 31, 2022, Magers received the official denial of her request for religious accommodation that blankly stated she was "not qualified for a reasonable accommodation."  The denial also stated that Magers had until April 22, 2022, to become vaccinated, or face termination on April 29, 2022, and that she would receive no severance if she chose to remain unvaccinated.

134.    Magers was never personally contacted by a member of the accommodation review panel.  No person sought to clarify the sincerity or religious nature of her religious beliefs.  When denying Mager's request, AstraZeneca also did not challenge the sincerity or religious nature of her beliefs that conflicted with the Mandate, but rather emphasized the potential undue hardship that accommodating her presented to the company.

135.    Magers' denial letter contained identical language to the denials sent to all other Plaintiffs.  In its denial letter, AstraZeneca emphasized the undue hardship that may result from accommodating Magers.  In highlighted blue font, AstraZeneca instructed that undue hardship "can include, but is not limited to, business disruption/increased costs resulting from illness-related absences."

136.    However, upon information and belief, AstraZeneca accommodated many employees, including younger employees, who held substantially similar roles to Magers.

137.    Moreover, AstraZeneca could have simply recognized Magers' natural immunity as a no-cost accommodation option.  In fact, because of the documented strength of natural immunity, the Mandate should not have applied to her in the first place.  At the time of her termination, Magers possessed natural immunity to COVID-19. AstraZeneca was aware of Magers' natural immunity when it terminated her employment.  Thus, AstraZeneca's insistence that she sacrifice her religious convictions and become immunized artificially in order to keep her job was altogether unnecessary.

138.    In addition to having natural immunity recognized as a no-cost accommodation option, AstraZeneca could have accommodated Magers with temporary remote work or enhanced safety protocols, like those Magers had utilized throughout the height of the pandemic.  Magers'

job role could have been performed 100% remotely.  In fact, several sales offices at AstraZeneca conducted their operations entirely over Zoom calls, and Magers performed her job duties entirely remotely for a significant amount of time during the pandemic.  There was never discussion from AstraZeneca to Magers on the possibility for remote work as an accommodation option. AstraZeneca could have also permitted weekly testing for COVID-19 (which Magers was willing to pay for and which is a more reliable indication of safety than vaccination).

139.    AstraZeneca terminated Magers on April 29, 2022, classifying her termination as "for cause" which allowed AstraZeneca to avoid paying severance and other benefits to Magers per company policy.

140.    As a result of AstraZeneca's actions, Magers' finances have been significantly impacted.  She is making significantly less money than she was with AstraZeneca, lost her benefits package, and was denied her Q1 bonus.

141.    In addition to financial loss, Magers suffered emotional and psychological harm from the months of uncertainty and repeated coercion to abandon her sincere religious beliefs in order to preserve her livelihood and career.  As a result of the discriminatory treatment she experienced, she is suffering from emotional distress which is or has been marked by lack of focus and mental errors in everyday life; feelings of despondency; social anxiety; loss of interest in leisure activities; and feelings of agitation, and irritability.

### **Megan Small**

142.    Small was born in 1976.  She is currently 46 years old and was the same age when AstraZeneca terminated her employment.  Shortly after her termination, AstraZeneca dispersed Small's job duties between DiCenso and Yarkosky. At approximately 36 years old, Yarkosky is

substantially younger than Small. Thus, because of Small's termination, the average age of AstraZeneca's workforce was reduced.

143.    Beginning in September 2021, Small was required to submit weekly COVID-19 PCR tests based solely on her vaccination status.  Vaccinated employees were not subject to this requirement.   Consequently, before instituting the Mandate, AstraZeneca knew Small was unvaccinated and that she was over the age of 40.

144.    Because she has sincerely held religious beliefs that preclude her from receiving a COVID-19 vaccine, Small submitted a request for religious accommodation to the Mandate on February 24, 2022.  Small cited her Christian practice of protecting God's design for her immune system, stating that her "body is a temple of the Holy Spirit" and that "God created [her] with an immune system and [she] object[s] to the COVID-19 vaccine that would modify God's design of [her] immune system," along with supporting Bible verses.  Small stated that as a Christian, her "sincerely held religious beliefs are an all-encompassing aspect of [her] life."  Small indicated that her convictions surrounding this belief were strengthened when the COVID-19 vaccines became available, and that she had only received vaccines as a child due to her parents' decision.

145.    On information and belief, many employees, including younger employees, who submitted exemption requests based on the Christian belief of protecting God's design for the immune system, were granted accommodations.

146.    On March 31, 2022, Small received the official denial of her request for religious accommodation that blankly stated she was "not qualified for a reasonable accommodation."  The denial also stated that Small had until April 22, 2022, to become vaccinated, or face termination on April 29, 2022, and that she would receive no severance should she remain unvaccinated.

147.    Small's denial letter contained identical language to the denials sent to all other Plaintiffs.  In its denial letter, AstraZeneca emphasized the undue hardship that may result from accommodating Small.  Small was never personally contacted by a member of the accommodation review panel. No person sought to clarify the sincerity or religious nature of her religious beliefs. When denying Small's request, AstraZeneca did not challenge the sincerity or religious nature of her beliefs that conflicted with the Mandate, but rather emphasized the potential undue hardship that accommodating Small presented to the company. In highlighted blue font, AstraZeneca instructed that undue hardship "can include, but is not limited to, business disruption/increased costs resulting from illness-related absences."

148.    However, AstraZeneca provided no explanation specific to Small's individual circumstances as to why it would be an undue hardship to accommodate her religious beliefs. Upon information and belief, AstraZeneca accommodated many employees, including younger employees, who held substantially similar roles to Small.

149.    AstraZeneca could have accommodated Small with temporary remote work or enhanced safety protocols, like those Small had utilized throughout the height of the pandemic. Small could have also been accommodated with a temporary remote work arrangement.  In fact, several sales offices at AstraZeneca conducted their operations entirely over Zoom calls. There was never discussion from AstraZeneca to Small on possible transfer to such a working environment or to a temporary telework arrangement until the pandemic subsided.  AstraZeneca could have also permitted weekly testing for COVID-19 (which Small was willing to pay for and which is a more reliable indication of safety than vaccination).

150.    Small attempted to speak with Human Resources several times regarding her denial but received no reply. Small had never taken a sick day from work (other than for a prior back injury), while several of her vaccinated colleagues were continually contracting COVID-19 and having to take time off for work. Small requested several times that she be allowed to test regularly as an accommodation but was told that no one would speak to her on this matter.

151.    In her role as diversity and inclusion liaison, Small collected and relayed messages between her team members and the corporate Diversity and Inclusion efforts. Part of her role included promoting various religious beliefs and the company's efforts to accommodate different belief systems. However, Small observed a stark omission of Christianity as ever being acknowledged or promoted by AstraZeneca's Diversity and Inclusion team.

152.    AstraZeneca terminated Small on April 29, 2022, classifying her termination as "for cause" which allowed AstraZeneca to avoid paying severance and other benefits per company policy.

153.    As a result of AstraZeneca's actions, Small's finances have been negatively impacted. Small was denied her earned Q1 bonus and makes significantly less money now than she did as an AstraZeneca employee.

154.    In addition to financial loss, Small suffered emotional and psychological harm from the months of uncertainty and repeated coercion to abandon her sincere religious beliefs in order to preserve her livelihood and career.  As a result of the discriminatory treatment she experienced, she is suffering from emotional distress which is or has been marked by lack of focus and mental errors in everyday life; feelings of despondency; social anxiety; loss of interest in leisure activities; and feelings of agitation, and irritability.

44

**Regina Rusgrove**

155.     Rusgrove was born in 1970.  She is currently 52 years old and was 51 at the time AstraZeneca terminated her employment.  Rusgrove's replacement was an internal transfer of a similar age to Rusgrove.  However, on information and belief, her replacement's position was not backfilled, in which case the average age of AstraZeneca's workforce decreased.

156.     Beginning in September 2021, Rusgrove was required to submit weekly COVID-19 PCR tests based solely on her vaccination status.  Vaccinated employees were not subject to this requirement.   Thus, before instituting the Mandate, AstraZeneca knew Rusgrove was unvaccinated and that she was over the age of 40.

157.     Because she has sincerely held religious beliefs that preclude her from receiving a COVID-19 vaccine, Rusgrove submitted a request for religious accommodation to the Mandate on February 28, 2022.  Rusgrove stated that she is "guided by the Holy Spirit in all areas of [her] life" and that through this guidance, she was directed by the Holy Spirit to decline receiving the COVID-19 vaccine.  Rusgrove indicated in her request that she has practiced living by the Holy Spirit's guidance for over 30 years and is a member of a local Christian church.

158.     On March 16, 2022, Rusgrove received a list of secondary questions that were unresponsive to the statements she included in her initial request.  Certain questions were redundant (already answered in Rusgrove's request), while others appeared to be generated by phrases cited by Rusgrove, but were illogical relative to the actual substance of her request. For example, one of the follow-up questions stated:

> Your request mentions that you cannot get vaccinated because of
> your beliefs that your body is a temple and you are prohibited from
> putting harmful substances into your body. To help us understand
> your religious beliefs better, can you confirm whether, for the period

> while you have held these religious beliefs, you have smoked
> cigarettes, consumed alcohol, received any tattoos or used any legal
> recreational drugs? If yes, please describe why these activities do
> not violate your religious belief that your body should not be
> subjected to anything that may harm it.

159.   However, Rusgrove's initial request made no mention of her body being a "temple" nor did she state the basis of her objection as relating to "harmful substances."

160.   On information and belief, many employees, including younger employees, who submitted exemption requests based on guidance from the Holy Spirit, were granted accommodations and the sincerity and religious nature of their beliefs were not challenged.

161.   On March 31, 2022, Rusgrove received the form denial of her request for religious accommodation, instructing that she was "not qualified for a reasonable accommodation."  The denial also stated that Rusgrove had until April 22, 2022, to become vaccinated, or face termination on April 29, 2022, and that she would receive no severance should she remain unvaccinated.

162.   Rusgrove was never personally contacted by a member of the accommodation review panel.  No person sought to clarify the sincerity or religious nature of her religious beliefs. When denying Rusgrove's request, AstraZeneca did not challenge the sincerity or religious nature of her beliefs that conflicted with the Mandate, but rather emphasized the potential undue hardship that accommodating Rusgrove presented to the company.

163.   Rusgrove's denial letter contained identical language to the denials sent to all other Plaintiffs.  In its denial letter, AstraZeneca emphasized the undue hardship that may result from accommodating Rusgrove.  In highlighted blue font, AstraZeneca instructed that undue hardship "can include, but is not limited to, business disruption/increased costs resulting from illness-related absences."

164.     However, AstraZeneca provided no explanation specific to Rusgrove's individual circumstances as to why it would be an undue hardship to accommodate her religious beliefs. Upon information and belief, AstraZeneca accommodated many employees, including younger employees, who held substantially similar roles to Rusgrove.

165.     AstraZeneca could have accommodated Rusgrove with temporary remote work or enhanced safety protocols, like those Rusgrove had utilized throughout the height of the pandemic. Rusgrove's job role could have been performed 100% remotely.  In fact, several sales offices at AstraZeneca conducted their operations entirely over Zoom calls, and Rusgrove performed her job duties 100% remotely for a significant amount of time during the pandemic. There was never discussion from AstraZeneca to Rusgrove on possible transfer to such a working environment or to a temporary telework arrangement until the pandemic subsided.  AstraZeneca could have also permitted weekly testing for COVID-19 (which Rusgrove was willing to pay for and which is a more reliable indication of safety than vaccination).

166.     AstraZeneca terminated Rusgrove on April 29, 2022, classifying her termination as "for cause," which allowed AstraZeneca to avoid paying severance and other benefits per company policy.

167.     As a result of AstraZeneca's actions, Rusgrove's finances have been significantly impacted. Rusgrove lost her benefits package and was denied her earned Q1 bonus. Rusgrove lost all medical, dental, and life insurance benefits for her and her daughter.  This required Rusgrove and her daughter to transition onto her husband's more costly insurance plan.

168.     In addition to financial loss, Rusgrove suffered emotional and psychological harm from the months of uncertainty and repeated coercion to abandon her sincere religious beliefs in

47

order to preserve her livelihood and career.  As a result of the discriminatory treatment she experienced, she is suffering from emotional distress which is or has been marked by lack of focus and mental errors in everyday life; feelings of despondency; social anxiety; loss of interest in leisure activities; and feelings of agitation, and irritability.

## Lisa Marshall

169.    Marshall was born in 1977.  She is currently 45 years old and was 44 at the time AstraZeneca terminated her employment. The age of Marshall's replacement has not been determined.  Marshall was subjected to religious discrimination.

170.    For 8 years and 10 months, Marshall worked for AstraZeneca as a Senior Pharmaceutical Sales Specialist in the Cardiovascular department. During her tenure, Marshall received three promotions in under 9 years.  Marshall's performance record was exceptional, and she earned long-term incentive awards during the pandemic due to her high performance.

171.    Beginning in September 2021, Marshall was required to submit weekly COVID-19 PCR tests based solely on her vaccination status.  Vaccinated employees were not subject to this requirement.  Thus, before instituting the Mandate, AstraZeneca knew Marshall was unvaccinated, that it was because of her religious beliefs, and that she was over the age of 40.

172.    Because she has sincerely held religious beliefs that preclude her from receiving a COVID-19 vaccine, Marshall submitted a request for religious accommodation to the Mandate on February 25, 2022.  Marshall cited her Christian practice of following all guidance given to her by the Holy Spirit, along with supporting Bible verses.  Marshall stated that "[a]s a born-again Christian and a believer and follower of Jesus Christ, I have been given the Holy Spirit to live inside of me.  My body is His dwelling place and I do not take that lightly.  I have been in constant

48

prayer seeking the will of God as to whether I should receive this vaccine and the Holy Spirit continues to lead me away from receiving it." Marshall also cited to the COVID-19 vaccines' reliance on aborted fetal cell lines in testing and development as independent religious objections. Marshall highlighted in her request that she has practiced living by the Holy Spirit's guidance since she was 8 years old and is a member of a local, non-denominational Christian church, where she serves as a Sunday School teacher. Marshall emphasized that her entire life is driven by her relationship with God and Jesus Christ and that all decisions, including her decision to decline the COVID-19 vaccine, derive from the guidance received through prayer.

173.    On or around March 16, 2022, Marshall received a list of standardized questions that were unresponsive to the statements she included in her initial request. Several questions were either redundant (already answered in Marshall's initial request) or appeared to be generated by phrases cited by Marshall, but illogical relative to the actual substance of her underlying request. For example, one of the follow-up questions robotically stated:

> Your request mentions that you cannot get vaccinated because of your beliefs that your body is a temple and you are prohibited from putting harmful substances into your body. To help us understand your religious beliefs better, can you confirm whether, for the period while you have held these religious beliefs, you have smoked cigarettes, consumed alcohol, received any tattoos or used any legal recreational drugs? If yes, please describe why these activities do not violate your religious belief that your body should not be subjected to anything that may harm it.

174.    Marshall's initial request, however, made no mention of avoiding potentially harmful substances due to her body being a Temple of the Holy Spirit.

175.   On information and belief, many employees, including younger employees, who submitted exemption requests based on guidance from the Holy Spirit, were granted accommodations and the sincerity and religious nature of their beliefs were not challenged.

176.   On March 31, 2022, Marshall received the form denial that stated she was "not qualified for a reasonable accommodation."  The denial also stated that Marshall had until April 22, 2022, to become vaccinated, or face termination on April 29, 2022, and that she would receive no severance if she remained unvaccinated.

177.   Marshall's denial letter contained identical language to the denials sent to all other Plaintiffs.  In its denial letter, AstraZeneca emphasized the undue hardship that may result from accommodating Marshall.  In highlighted blue font, AstraZeneca instructed that undue hardship "can include, but is not limited to, business disruption/increased costs resulting from illness-related absences."  Marshall was never personally contacted by a member of the accommodation review panel.  No person sought to clarify the sincerity or religious nature of her religious beliefs.  When denying Marshall's request, AstraZeneca also did not challenge the sincerity or religious nature of her beliefs that conflicted with the Mandate, but rather emphasized the potential undue hardship that accommodating Small presented to the company.

178.   However, AstraZeneca provided no explanation specific to Marshall's individual circumstances as to why it would be an undue hardship to accommodate her religious beliefs. Upon information and belief, AstraZeneca accommodated many employees, including younger employees, who held substantially similar roles as Marshall.

179.   In addition to providing the same religious accommodations it did to other similarly situated employees, AstraZeneca could have accommodated Marshall by simply acknowledging

50

her natural immunity to COVID-19.  In fact, because of the documented strength of natural immunity, the Mandate should not have applied to her in the first place. Thus, AstraZeneca's insistence that Marshall sacrifice her religious convictions and become immunized artificially in order to keep her job was altogether unnecessary.

180.    In the alternative, she could have been granted temporary remote work or enhanced safety protocols, like those Marshall had utilized throughout the height of the pandemic. Marshall's job role could have been performed 100% remotely.  In fact, several sales offices at AstraZeneca conducted their operations entirely over Zoom calls, and Marshall performed her duties 100% remotely for significant amounts of time during the pandemic.  There was never discussion from AstraZeneca to Marshall on possible transfer to such a working environment or to a temporary telework arrangement until the pandemic subsided.  AstraZeneca could have also permitted weekly testing for COVID-19 (which Marshall was willing to pay for and which is a more reliable indication of safety than vaccination).

181.    AstraZeneca terminated Marshall on April 29, 2022, classifying her termination as "for cause" which allowed AstraZeneca to avoid paying severance and other benefits to Marshall per company policy.  It is unclear whether Marshall was backfilled with a substantially younger employee.

182.    As a result of AstraZeneca's actions, Marshall's finances have been negatively impacted.  Marshall lost her benefits package and was denied her earned Q1 bonus.  Marshall lost all medical, dental, and life insurance benefits which she used to cover her entire family. Marshall's family had to transfer onto her husband's insurance, which was more costly.

183.     In addition to financial loss, Marshall suffered emotional and psychological harm from the months of uncertainty and repeated coercion to abandon her sincere religious beliefs in order to preserve her livelihood and career.  As a result of the discriminatory treatment she experienced, she is suffering from emotional distress which is or has been marked by lack of focus and mental errors in everyday life; feelings of despondency; social anxiety; loss of interest in leisure activities; and feelings of agitation, and irritability.

## COLLECTIVE ACTION ALLEGATIONS

184.     Plaintiffs bring this collective action pursuant to 29 U.S.C. §§ 216(b), 626(b) of the Fair Labor Standards Act, on behalf of themselves and on behalf of all other persons similarly situated (the "**Collective**").

185.     Plaintiffs and other potential members of the Collective are similarly situated in that they all suffered adverse action on their employment due to AstraZeneca's comprehensive policy and active efforts to lower the average age of the workforce.  More specifically, AstraZeneca, at a corporate level since as early as 2018, implemented a policy to eliminate employees over 40 and to simultaneously prioritize the hiring and promotion of younger, under 40 employees.  The termination of a large number of employees over the age of 40 on April 29, 2022 was a continuation of that already existing policy.

186.     There are many similarly situated putative Collective members who would benefit from the issuance of a court-supervised notice of the present lawsuit and the opportunity to join the present lawsuit. Notice should be sent to the collective pursuant to 29 U.S.C. §§ 216(b), 626(b).

187.     As part of its regular business practice, since at least 2018, AstraZeneca has intentionally, willfully, and repeatedly, engaged in a pattern, practice, and/or policy of age

discrimination in violation of the ADEA with respect to Plaintiffs and the Collective. This pattern, practice, and/or policy includes, but is not limited to:

a. Willfully cultivating a corporate culture of age discrimination;

b. Willfully implementing a company-wide policy to recruit and prioritize the hiring of employees under the age of 40, while simultaneously instituting a company-wide policy to terminate, demote, out-process, or otherwise force employees over the age of 40 out of the company;

c. Willfully instituting and cultivating a company-wide hiring practice that made clear to hiring managers that they should prioritize hiring younger candidates;

d. With actual knowledge, in September of 2021, that the strong majority of its unvaccinated workforce was over the age of 40, willfully instituting a company-wide compulsory COVID-19 vaccination policy in January of 2022 and then utilizing that same policy and attendant exemption process to willfully eliminate a substantial number of employees over the age of 40 from the workforce;

e. Willfully instituting what was a company-wide reduction in force under the guise of the Mandate and workplace safety, and removing hundreds of employees over the age of 40 from the workforce while retaining employees who were significantly younger;

f. Instituting a corporate policy to willfully disregarding the natural immunity of employees aged 40 and over and terminating them on unjustifiable grounds that they were an unacceptable risk to the company;

g.   Intimidating employees over the age of 40 by openly advocating in company-wide presentations AstraZeneca's desire to lower the average age of the workforce;

h.   Willfully pursuing a strategy to hire a pre-set percentage of employees under the age of 30 while simultaneously seeking to reduce the number of new hires who over the age of 40;

i.   Willfully instituting a company-wide compulsory COVID-19 vaccination policy when AstraZeneca knew or should have known that: (1) the available vaccines were ineffective at preventing transmission and infection, and (2) the policy would impact employees over the age of 40 at statistically greater rates;

j.   Willfully instituting a company-wide compulsory COVID-19 vaccination policy when AstraZeneca knew or should have known that a large percentage of its unvaccinated employees over the age of 40 possessed natural immunity and then terminating those same employees on spurious "workplace safety grounds"; and

k.   Willfully utilizing the Mandate and exemption process as cover for the termination of hundreds of employees over the age of 40 due to the statistical likelihood that those employees over 40 are more likely to be religious and more likely to have medical conditions (when compared with younger employees) preventing them from receiving a COVID-19 vaccine.

188.   AstraZeneca maintained and implemented these policies and practices with the purpose and effect of subjecting Plaintiff other members of the Collective to adverse employment action because of their age.

54

189.     AstraZeneca is aware or should have been aware that federal law requires it to conduct recruitment and hiring for the relevant positions without regard to an applicant's age, and that it must not otherwise subject employees to adverse employment action because of their age.

## CLASS ALLEGATIONS

190.     Plaintiffs also bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and on behalf of all other persons similarly situated.

191.     There are three distinct classes.  The first class consists of former AstraZeneca employees who possessed natural immunity on the date they were terminated, submitted a religious exemption request, and were pretextually denied.  These employees were subjected to religious discrimination because they were forced, without conceivable or lawful justification, to choose between adhering to their religious beliefs and continued employment.  Simply put, the Mandate should not have applied to them in the first place because they posed no greater threat to the workforce than their vaccinated secular colleagues.  AstraZeneca's irrational insistence that they violate their religious beliefs constitutes a Title VII violation in and of itself, and this violation predated the sham accommodations process.

192.     The second class consists of former AstraZeneca employees who submitted a religious exemption request and were subjected to a sham accommodations process whereby an individualized good faith review did *not* occur, and auto-generated questions infected, with fatal and unlawful outcomes, AstraZeneca's evaluation of whether these employees were entitled to a religious accommodation.  AstraZeneca cannot now claim that Plaintiffs' beliefs are not religious in nature, that Plaintiffs lacked sincere religious beliefs, or that Plaintiffs cannot be accommodated

without undue hardship because the relevant inquiries were never actually or meaningfully performed before the mass termination was executed.

193.    The third class consists of former employees who AstraZeneca terminated based on the perception that they were perpetually infected with COVID-19 and regarded as having the disability of a deficient immune system and/or as though they were perpetually infected with COVID-19 and would be a perpetual burden on the workforce.

194.    Plaintiffs propose the following classes and class definitions, subject to amendment as appropriate:

**A.  Religious Class – Natural Immunity**

195.    AstraZeneca subjected Plaintiffs Wilhoit, Dennard, Magers, and Marshall to a pattern and practice of religious discrimination by forcing them to choose between their religious convictions and continued employment without lawful justification.  Plaintiffs Wilhoit, Dennard, Magers, and Marshall possessed natural immunity on the date they were terminated.  Therefore, they possessed equivalent, and likely superior, protection against COVID-19 infection and transmission than their colleagues who possessed artificial immunity through vaccination alone. The following definition is proposed for the class of employees who possessed natural immunity and were subjected to religious discrimination due to being forced to choose between their religious beliefs and continued employment without lawful justification (the "**Natural Immunity Religious Class**"):

> Natural Immunity Religious Class:
> All former AstraZeneca employees who possessed natural immunity on April 29, 2022, who also sought religious exemption and religious accommodation from the Mandate, and because of the denial of their

> accommodation request, suffered adverse action on
> his/her employment.

196.    Plaintiffs reserve the right to modify or amend the definition of the proposed Natural Immunity Religious Class before the Court determines whether certification is appropriate.

197.    The proposed class meets the criteria for certification under Fed. R. Civ. P. 23 (a), (b)(2), and (b)(3).

198.    <u>Numerosity</u>. The class members are so numerous that joinder of all members is impracticable.  Though the exact number of class members is unknown at this time, based on information and belief, the Natural Immunity Religious Class consists of more than one hundred former employees of AstraZeneca who possessed natural immunity on April 29, 2022, who sought religious accommodation to the Mandate, were denied, and suffered resulting adverse employment action.  The identities of the class members are ascertainable through AstraZeneca's records, class members' records, publication notice, self-identification, or other means.

199.    <u>Commonality</u>. There are questions of law and fact common to the Natural Immunity Religious Class which predominate over any questions affecting only individual class members. The common questions of law and fact include, without limitation:

    a.   Whether AstraZeneca engaged in the conduct alleged herein;

    b.   Whether requiring religious employees possessing natural immunity to comply with the Mandate violated Title VII in that they were forced to choose between employment and their religious beliefs without rational justification;

    c.   Whether AstraZeneca knew, or should have known, that recognition of natural immunity was a suitable alternative to COVID-19 vaccination and insisted on

requiring artificial vaccination to pretextually force religious employees to choose between their religious beliefs and their jobs;

d.  Whether AstraZeneca sought to remove a large portion of its religious employees from the workplace and utilized the Mandate as the means to achieve its desired end;

e.  Whether AstraZeneca knew or should have known at the time it acted adversely against members of the Natural Immunity Religious Class that its vaccinated employees were contracting and spreading COVID-19 at the same, similar, or higher rates than its unvaccinated employees who possessed natural immunity;

f.  Whether AstraZeneca knowingly crafted and implemented its COVID-19 accommodations process to result in the removal of religious employees without having to otherwise pay severances or bonuses due;

g.  Whether a pre-determined ceiling for grants of religious accommodation drove the denials of religious exemption requests, rather than an individualized assessment;

h.  Whether AstraZeneca had financial incentives (or penalties) tied to contracts with the federal government that influenced the shaping, implementation, and ultimate results of the COVID-19 accommodations process;

i.  Whether AstraZeneca knew, or should have known, that recognition of natural immunity was a suitable alternative to COVID-19 vaccination that would not cause undue hardship AstraZeneca pretextually refused to consider;

j.   Whether religious employees possessing natural immunity should have been subjected to the Mandate in the first place, and whether AstraZeneca's refusal to recognize their natural immunity evidences discriminatory intent;

k.   Whether, considering that AstraZeneca provided religious accommodations to many employees in substantially similar roles to members of the Natural Immunity Religious Class, exempting members of the Natural Immunity Religious Class from the Mandate would pose any articulable (non-speculative) hardship on the company; and

l.   Whether AstraZeneca intentionally refused to pay otherwise earned bonuses to members of the Natural Immunity Religious Class in an attempt to further coerce religious employees to abandon their beliefs.

200.   <u>Typicality.</u> Plaintiffs Wilhoit, Dennard, Magers, and Marshall's claims are typical of those of other putative class members because they possessed natural immunity to COVID-19 on April 29, 2022, sought religious accommodation to the Mandate, were denied, and then suffered adverse employment action.

201.   <u>Adequacy of Representation</u>. Plaintiffs Wilhoit, Dennard, Magers, and Marshall will fairly and adequately represent and protect the interests of the Natural Immunity Religious Class members.  Plaintiffs' Counsel is competent and experienced in litigating class actions and is experienced in civil rights and employment litigation of this kind.

202.   <u>Predominance</u>.  AstraZeneca has engaged in a common course of conduct towards Plaintiffs Wilhoit, Dennard, Magers, and Marshall and Natural Immunity Religious Class members, in that these plaintiffs and putative class members were subject to the same overarching

Mandate without lawful or credible justification because they possessed strong and durable natural immunity against COVID-19.  The common questions of fact and law arising from Defendant's conduct affecting Natural Immunity Religious Class members outlined in this Complaint predominate over any individual issues and can be resolved through common answers to those questions.  Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

203.   Superiority.  A Class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Class treatment of common questions of law and fact is superior to the inevitable individual actions resulting in piecemeal litigation across several jurisdictions.  Moreover, absent class certification, most Natural Immunity Religious Class members would find that the cost of litigating their individual claims against a global pharmaceutical corporation to be prohibitively high and would therefore be without remedy.  The prosecution of single actions by individual Natural Immunity Religious Class members would create a risk of inconsistent or varying adjudications with respect to individual class members, which would establish incompatible standards of conduct for Defendants.  In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources, and the parties' resources, and protects the rights of each Natural Immunity Religious Class member.

204.   Finally, all members of the proposed Natural Immunity Religious Class are readily ascertainable.  Defendants have access to Natural Immunity Religious Class members' names, contact information, and employment records sufficient to provide notice to those affected by the class action.

**B. Religious Class – Process**

205.   AstraZeneca subjected Plaintiffs Wilhoit, Dennard, Magers, Small, Rusgrove, and Marshall to a pattern and practice of religious discrimination through the religious exemption and accommodation process ("the **Religious Process Class**").   The following definition is proposed for the class of employees who were subjected to religious discrimination through the religious accommodations process:

> Religious Process Class:
> All former AstraZeneca employees who were over the age of 40 when they sought religious exemption and/or religious accommodation from the Mandate, were denied a religious accommodation because AstraZeneca determined they "were not qualified" for an accommodation and/or determined that their beliefs were insincere or not religious in nature after their request was assessed using automated questions, and because of the denial, suffered adverse action on his/her employment.

206.   Plaintiffs reserve the right to modify or amend the definition of the proposed Religious Process Class before the Court determines whether certification is appropriate.

207.   The proposed class meets the criteria for certification under Fed. R. Civ. P. 23 (a), (b)(2), and (b)(3).

208.   Numerosity. The class members are so numerous that joinder of all members is impracticable.   Though the exact number of class members is unknown at this time, based on information and belief, the Religious Process Class consists of hundreds of former employees of AstraZeneca, who sought religious accommodation to the Mandate, were denied, and suffered resulting adverse employment action.   The identities of the members of the Religious Process Class

are ascertainable through AstraZeneca's records, class members' records, publication notice, self-identification, or other means.

209.   <u>Commonality</u>. There are questions of law and fact common to the Religious Process Class which predominate over any questions affecting only individual class members. The common questions of law and fact include, without limitation:

a.   Whether AstraZeneca engaged in the conduct alleged herein;

b.   Whether AstraZeneca violated Title VII in the application of its religious accommodation policy and procedure by utilizing computer assisted technology to evaluate and deny religious accommodation requests;

c.   Whether AstraZeneca denied religious accommodation to members of the Religious Process Class after their requests were assessed by some type of automated process that could not realistically assess the sincerity or religious nature of each individual employee's beliefs;

d.   Whether AstraZeneca sought to remove a large portion of its religious employees from the workplace and utilized the Mandate as the means to achieve its desired end;

e.   Whether AstraZeneca specifically discriminated against employees of Christian faith traditions, resulting in substantially greater percentage of denials to those of Christian faith traditions when compared to religious employees who did not belong to Christian faith traditions;

f.   Whether AstraZeneca utilized computer software or any other computer assisted technology in its accommodations process to afford the appearance of individualized assessment when one did not in fact occur;

g.   Whether AstraZeneca sent auto-generated follow-up questions to individuals of certain faiths, but not to others, based on a set of pre-determined parameters rather than on an actual individualized assessment;

h.   Whether AstraZeneca specifically targeted those employees of Christian faith traditions, utilizing 'key words' commonly associated with Christian objections to the COVID-19 vaccine to prompt intrusive secondary questions, while not sending similar secondary questions to employees from other faith traditions;

i.   Whether pre-determined ceiling for grants of religious accommodation drove the denials, rather than the sincerity and religious nature of employees' beliefs or any purported hardship asserted by AstraZeneca;

j.   Whether AstraZeneca had financial incentives (or penalties) tied to contracts with the federal government that influenced the shaping, implementation, and ultimate results of the COVID-19 accommodations process;

k.   Whether AstraZeneca knew at the time it acted adversely against Class Members that its vaccinated employees were contracting and spreading COVID-19 at the same, or higher rates, than its unvaccinated employees;

l.   Whether AstraZeneca knowingly crafted and implemented its COVID-19 accommodations process to result in the removal of religious employees without having to otherwise pay severances or bonuses due;

63

m. Whether AstraZeneca knew, or should have known, that recognition of natural immunity was a suitable alternative to COVID-19 vaccination and insisted on requiring artificial vaccination to pretextually force religious employees to choose between their religious beliefs and their job;

n. Whether AstraZeneca knew, or should have known, that recognition of natural immunity was a suitable alternative to COVID-19 vaccination that would not cause undue hardship AstraZeneca pretextually refused to consider;

o. Whether religious employees possessing natural immunity should have been subjected to the Mandate in the first place, and whether AstraZeneca's refusal to recognize their natural immunity evidences discriminatory intent with regard to the entire Religious Process Class;

p. Whether, considering that AstraZeneca provided religious accommodations to many employees in substantially similar roles to Plaintiffs and those similarly situated, exempting members of the Religious Process Class from the Mandate would pose any articulable (non-speculative) hardship on the company; and

q. Whether AstraZeneca intentionally refused to pay otherwise earned bonuses to Plaintiffs and class members in an attempt to further coerce religious employees to abandon their beliefs.

210. <u>Typicality.</u> Plaintiffs Wilhoit, Dennard, Magers, Small, Rusgrove, and Marshall's claims are typical of those of other Religious Process Class members because they were over 40 when they were denied religious accommodation, their requests were assessed by some type of automated or standardized process that could not realistically assess the sincerity or religious

nature of their beliefs, they were determined to be unqualified for an accommodation, and because of the denials, suffered adverse action on their employment.

211.    <u>Adequacy of Representation</u>. Plaintiffs Wilhoit, Dennard, Magers, Small, Rusgrove, and Marshall will fairly and adequately represent and protect the interests of the members of the Religious Process Class.  Plaintiffs' Counsel is competent and experienced in litigating class actions and is experienced in civil rights and employment litigation of this kind.

212.    <u>Predominance</u>. AstraZeneca has engaged in a common course of conduct toward Plaintiffs Wilhoit, Dennard, Magers, Small, Rusgrove, and Marshall and members of the Religious Process Class, in that all these plaintiffs and members of the Religious Process Class were subject to the same overarching Mandate and the same systematized accommodations process relating thereto.  The common questions of fact and law arising from Defendant's conduct affecting members of the Religious Process Class outlined in this Complaint predominate over any individual issues and can be resolved through common answers to those questions.  Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

213.    <u>Superiority.</u>  A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to the inevitable individual actions resulting in piecemeal litigation across several jurisdictions.  Moreover, absent class certification, most members of the Religious Process Class would find that the cost of litigating their individual claims against a global pharmaceutical corporation to be prohibitively high and would therefore be without remedy.  The prosecution of single actions by individual members of the Religious Process Class would create a risk of

inconsistent or varying adjudications with respect to individual members of the Religious Process Class, which would establish incompatible standards of conduct for Defendants.  In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources, and the parties' resources, and protects the rights of each member of the Religious Process Class.

214.    Finally, all members of the proposed Religious Process Class are readily ascertainable. Defendants have access to class members' names, contact information, and employment records sufficient to provide notice to those affected by the class action.

**C.  ADA "Regarded As" Disability Class**

215.    AstraZeneca also subjected Plaintiffs Wilhoit, Dennard, Magers, Small, Rusgrove, and Marshall to a pattern and practice of disability-based discrimination ("the **Disability Class**") by regarding them as disabled and then terminating their employment on the basis of a perceived disability.  Plaintiffs propose the following definition, subject to amendment as appropriate, for the Disability Class:

> Main Class:
> All former AstraZeneca employees who, due to their lack of COVID-19 vaccination, were regarded by AstraZeneca as having a disability, and because of this perceived disability, suffered adverse action on his/her employment.
>
> Natural Immunity Subclass:
> All former AstraZeneca employees who were unvaccinated when they suffered adverse action on his/her employment and who possessed natural immunity on April 29, 2022.

216.    Plaintiffs reserve the right to modify or amend the definition of the proposed class and subclass before the Court determines whether certification is appropriate.

217.    The proposed class meets the criteria for certification under Fed. R. Civ. P. 23 (a), (b)(2), and (b)(3).

218.    <u>Numerosity</u>. The members of the Disability are so numerous that joinder of all members is impracticable.  Though the exact number of class members is unknown at this time, based on information and belief, the class consists of hundreds of former employees of AstraZeneca, who by nature of being unvaccinated against COVID-19, were regarded as disabled by AstraZeneca and suffered adverse action on their employment as a result of their perceived disabilities.  The identities of the members of the Disability Class are ascertainable through AstraZeneca's records, class members' records, publication notice, self-identification, and other means.

219.    <u>Commonality</u>. There are questions of law and fact common to the Disability Class, and Natural Immunity Subclass, which predominate over any questions affecting only individual class members.  The common questions of law and fact include, without limitation:

a.  Whether AstraZeneca engaged in the conduct alleged herein;

b.  Whether AstraZeneca, beginning in September 2021, regarded members of the Disability Class as having a physical impairment relating to the physiological condition of their immune system, thereby regarding them as perpetually disabled and subjecting them to adverse employment action because of the perceived disability;

c.  Whether AstraZeneca terminated Plaintiffs and members of the Disability Class due to concerns that their perceived disability would adversely impact the company;

d.  Whether AstraZeneca terminated Plaintiffs and members of the Disability Class due to concerns that they were an unacceptable and increased risk to experience "long-Covid";

e.   Whether AstraZeneca knew, or should have known, that natural immunity to COVID-19 provides the same or greater protection against disease than the COVID-19 vaccines; and

f.   Whether AstraZeneca can credibly assert a direct threat defense against members of the Disability Class who possess natural immunity, but not simultaneously perceive its vaccinated employee as a direct threat.

220.   Typicality. Plaintiffs Wilhoit, Dennard, Magers, Small, Rusgrove, and Marshall's claims are typical of those of other members of the Disability Class because they suffered adverse employment action relating to the Mandate after AstraZeneca perceived them as disabled.

221.   Adequacy of Representation. Plaintiffs Wilhoit, Dennard, Magers, Small, Rusgrove, and Marshall will fairly and adequately represent and protect the interests of the members of the Disability Class.  Plaintiffs' Counsel is competent and experienced in litigating class actions and is experienced in civil rights and employment litigation of this kind.

222.   Predominance. AstraZeneca has engaged in a common course of conduct toward Plaintiffs and members of the Disability Class, in that Plaintiffs and members of the Disability Class were subject to the same overarching Mandate and were terminated on the basis of a perceived disability.  The common questions of fact and law arising from Defendant's conduct affecting Class Members outlined in this Complaint, predominate over any individual issues, and can be resolved through common answers to those questions.  Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

223.   Superiority. A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Class treatment of common questions of law and fact is

superior to the inevitable individual actions resulting in piecemeal litigation across several jurisdictions. Moreover, absent class certification, most members of the Disability Class would find that the cost of litigating their individual claims against an international pharmaceutical corporation to be prohibitively high and would therefore be without remedy. The prosecution of individual actions by members of the Disability Class would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources, the parties' resources, and protects the rights of each Class member.

224.    Finally, all members of the proposed Disability Class are readily ascertainable. Defendants have access to members of the Disability Class's names, contact information, and employment records sufficient to provide notice to those affected by the class action.

## CLAIMS FOR RELIEF

### COUNT I

**ADEA – DISPARATE TREATMENT AGE DISCRIMINATION**
**29 U.S.C. § 623(a)(1)**
**(On behalf of Plaintiffs Wilhoit, Hargrove, Dennard, Magers, Small, Rusgrove, and Marshall, and the Collective)**

225.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

226.    This claim is brought by Plaintiffs for themselves and on behalf of the Collective. Many of these plaintiffs have filed timely charges with the EEOC indicating their intention to file a representative action relating to AstraZeneca's age discrimination and it has been more that 60 days since several plaintiffs filed age-based class claims with the EEOC. Moreover, multiple plaintiffs have received a Notice of Right to Sue from the EEOC.

227.    At the highest levels of the company, AstraZeneca devised and then willfully implemented a company-wide policy to lower the average age of its workforce.  This policy deliberately targeted employees over the age of 40 for adverse employment action on the basis of their age.

228.    As they are all over the age of 40, Plaintiffs are all members of a protected class.

229.    As evidenced by their strong performance records, Plaintiffs were qualified for their jobs or the positions they applied for.

230.    Plaintiffs were all terminated, constructively discharged, were denied employment opportunities, or were otherwise subjected to adverse employment action because of their age.

231.    Plaintiffs were either replaced by employees who were significantly younger, their job duties were transitioned to employees who were significantly younger, or Plaintiffs applied and were rejected for jobs they were qualified for while AstraZeneca selected candidates who were significantly younger and less qualified for the job.

232.    AstraZeneca engaged in an intentional, company-wide, and systematic policy, pattern, and/or practice of discrimination against employees aged 40 and older while simultaneously prioritizing and preferentially treating younger employees and job candidates. This comprehensive policy was enacted and has been unlawfully acted upon since at least 2018.

233.     AstraZeneca has intentionally discriminated against Plaintiffs and the Collective in violation of the ADEA by, among other things:

      a.    Systematically 'encouraging' hiring managers to give priority to younger candidates, when a candidate aged 40 or over was more qualified for the position;

b. Willfully subjecting employees over the age of 40 to an ongoing pattern or practice of discriminatory failure to hire such persons because of their age in violation of Section 4 of the ADEA, 29 U.S.C. § 623(a);

c. Willfully implementing a corporate-wide COVID-19 vaccine requirement—at a time when vaccine inefficacy was well established—with foreknowledge that the strong majority of unvaccinated employees who would be subject to termination for noncompliance with the Mandate were over the age of 40;

d. Willfully terminating unvaccinated employees over the age of 40 who possessed natural immunity to COVID-19, with knowledge that their natural immunity provided strong protection against COVID-19;

e. Willfully implementing what was effectively a comprehensive reduction in force under the pretext of workplace safety and the accommodations scheme, a process that eliminated up to 200 employees over the age of 40 and very few employees under the age of 40;

f. Willfully engaging in a pattern and practice of preferencing younger employees at the expense of older employees through:

    i. Willfully and systematically replacing employees 40 and over with employees who were substantially younger;

    ii. Willfully and systematically eliminating older employee's roles entirely and then delegating their job duties to substantially younger employees;

iii. Willfully instituting a pattern and practice of shuffling employees in a manner where the net result was to lower the average age of the workforce; and

iv. Willfully denying employment opportunities to employees over the age of 40 and choosing less qualified and younger candidates for the position in question.

g. Willfully subjecting employees age 40 and over to a hostile workplace and causing them to self-terminate because of a culture of age discrimination that was sufficiently hostile to cause a reasonable employee in the same circumstances to resign;

h. Willfully conducting company-wide and region-wide meetings where executive leadership openly discussed the strategy to lower the average age workforce, prioritize the hiring of younger candidates, and then acting on this strategy;

i. Willfully and systematically forcing employees age 40 and over to transfer into less desirable positions because of their age; and

j. Willfully and systematically denying transfer requests of employees aged 40 and over.

234.    These company-wide policies are intended to and have had the effect of adversely affecting the terms and conditions of Plaintiffs' employment because of their age.    The discriminatory acts that constitute AstraZeneca's pattern and/or practice of discrimination have occurred both within and outside the liability period in this case.

235.    Age is not a bona fide occupational qualification for any of the positions in question.

236.    The foregoing conduct, in addition to the allegations throughout this Complaint, constitutes intentional discrimination prohibited under 29 U.S.C. § 623(a)(1).

237.    As a direct and proximate result of the discriminatory treatment experienced, Plaintiffs are suffering the injuries and damages hereinafter described throughout this Complaint. Accordingly, Plaintiffs request relief as hereinafter described.

### COUNT II

**ADEA – DISPARATE IMPACT AGE DISCRIMINATION**
**29 U.S.C. § 623(a)(2)**
**(On behalf of Plaintiffs Wilhoit, Dennard, Magers, Small, Rusgrove, and Marshall, and the Collective)**

238.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

239.    This claim is brought by Plaintiffs Wilhoit, Dennard, Magers, Small, Rusgrove, and Marshall for themselves and on behalf of the Collective.

240.    AstraZeneca's Mandate, both in its imposition and the subsequent accommodations process, resulted in a statistically significant and unlawful disparity between employees aged 40 and above and employees under 40.  Specifically, the Mandate adversely impacted employees over the age of 40 at statistically significant rates.

241.    At the time AstraZeneca announced the Mandate, AstraZeneca possessed actual knowledge that a statistically significant disparity existed between unvaccinated employees 40 and above and employees under the age of 40.

73

242.    The accommodations process resulted in statistically significant disparities in the denial of accommodation requests for those employees aged 40 and above when compared to those under age 40.

243.    AstraZeneca's blanket assertion that certain employees were "not qualified" for an accommodation resulted in statistically significant disparate outcomes on employees aged 40 and above when compared to younger employees and those age 40 and below.

244.    Because of the Mandate and the specific methodology used in the accommodations process, there was a decrease in the average age of AstraZeneca's workforce.

245.    Because AstraZeneca's vaccinated employees were contracting and spreading COVID-19 at similar or higher rates than its unvaccinated employees during the relevant timeframes, the Mandate cannot be justified by a reasonable factor other than age.  The Mandate cannot be justified by any reasonable factor other than age.

246.    The foregoing conduct, in addition to the allegations throughout this Complaint, constitutes unlawful disparate impact discrimination prohibited under 29 U.S.C. § 623(a)(2).

247.    As a direct and proximate result of AstraZeneca's discriminatory actions, Plaintiffs are suffering the injuries and damages hereinafter described.  Accordingly, Plaintiffs request relief as hereinafter described.

## COUNT III

### TITLE VII – DISPARATE TREATMENT – RELIGION
### 42 U.S.C. § 2000e-2(a)
**(On behalf of Plaintiffs Wilhoit, Dennard, Magers, and Marshall, and the Natural Immunity Religious Class)**

248.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

74

249.    This claim is brought by Plaintiffs Wilhoit, Dennard, Magers, and Marshall for themselves and on behalf of the Natural Immunity Religious Class.   Many of these plaintiffs have filed timely charges with the EEOC indicating their intention to file a representative action relating to AstraZeneca's pattern and practice of religious discrimination and plaintiffs Marshall and Magers have received a Notice of Right to Sue from the EEOC.

250.    Plaintiffs Wilhoit, Dennard, Magers, and Marshall possess sincere religious beliefs that preclude them from receiving a COVID-19 vaccine.   In fact, these plaintiffs lost their livelihoods for holding true to their religious beliefs, demonstrating the intensity of their convictions.   Regardless, because of their natural immunity, the sincerity and religious nature of their beliefs in conflict with the Mandate should have never been evaluated or questioned in the first place.

251.    Plaintiffs Wilhoit, Dennard, Magers, and Marshall possessed natural immunity on the date the were terminated.   Due to their natural immunity, these plaintiffs possessed at least equivalent and likely greater protection against COVID-19 than their vaccinated, secular colleagues.   Nonetheless, AstraZeneca forced them into a sham religious accommodation process, which, considering their natural immunity, should have never occurred.   The forced and unnecessary coercion to abandon their religious beliefs was a Title VII violation that predated the violations that occurred during the accommodations process.

252.    AstraZeneca's systematic refusal to recognize natural immunity, which has been established through hundreds of years of scientific research and will be affirmed by AstraZeneca's own records and immunologists, forced members of the Natural Immunity Religious Class, without justification, to choose between their religious beliefs and feeding their families.

253.   Plaintiffs Wilhoit, Dennard, Magers, and Marshall were otherwise qualified for their positions at AstraZeneca and were high performers in their respective roles.

254.   Plaintiffs Wilhoit, Dennard, Magers, and Marshall suffered adverse employment action because of their religious beliefs.

255.   Plaintiffs Wilhoit, Dennard, Magers, and Marshall were treated differently than similarly situated secular employees.

256.   AstraZeneca implemented its COVID-19 vaccination requirement very late relative to other companies who implemented a vaccination requirement in the Summer and Fall of 2021. When it implemented the Mandate in January of 2022, the Omicron variant of COVID-19 was dominant, and AstraZeneca had actual knowledge that the available vaccines were ineffective at preventing contraction and transmission of COVID-19.  Further, as a cutting-edge vaccine manufacturer with hyper-specialized and up-to-date knowledge on this issue, AstraZeneca cannot feign ignorance of vaccine inefficacy on the date it announced the Mandate.  Despite the fact that AstraZeneca knew its vaccinated secular employees were contracting and spreading COVID-19 at high rates during the relevant timeframes, the company did not subject these employees to any type of enhanced safety protocols, and, in fact, and irrationally, relaxed safety protocols for its vaccinated employees.

257.   Before instituting the Mandate, AstraZeneca had actual knowledge that a very large portion of its unvaccinated workforce was unable to receive a COVID-19 vaccine for religious reasons.

258.   Before instituting the Mandate, AstraZeneca had actual knowledge that a very large portion of its employees who could not receive a vaccine due to religious objections possessed

natural immunity. As a cutting-edge vaccine manufacturer with hyper-specialized knowledge on the issue of natural immunity, AstraZeneca cannot credibly feign ignorance of the relative strength of natural immunity.

259. AstraZeneca engaged in an intentional, company-wide, and systematic policy, pattern, and/or practice of religious discrimination against the Natural Immunity Religious Class. AstraZeneca has intentionally discriminated against Plaintiffs Wilhoit, Dennard, Magers, and Marshall and the Natural Immunity Religious Class in violation of Title VII by, among other things:

    a. Implementing the Mandate with intent to willfully purge as many religious employees as possible. The scheme was purposefully designed to grant or deny religious accommodation requests irrespective of the sincerity or religious nature of each employee's stated beliefs, or the company's ability to provide reasonable accommodations;

    b. Refusing to recognize religious employees' natural immunity as equivalent to vaccine-based immunity, and rather, irrationally and pretextually, insisting that religious employees possessing natural immunity sacrifice their religious beliefs in order to preserve their jobs; and

    c. Subjecting Plaintiffs Wilhoit, Dennard, Magers, and Marshall and members of the Natural Immunity Religious Class to an unnecessary and hostile religious inquisition, whereby the religious nature and sincerity of their religious beliefs were inauthentically evaluated through a standardized, non-personalized accommodations process. Ultimately, their employment was terminated as a direct

and proximate cause of this unlawful process and AstraZeneca's obstinate refusal to recognize their natural immunity as satisfying the company's immunization requirement.

260.    Notably, Plaintiffs Wilhoit, Dennard, Magers, and Marshall possessed strong performance records.  Due to their natural immunity, these highly productive employees posed no greater threat to the workforce than their unvaccinated secular colleagues.  Several of these plaintiffs received promotions and recognition for their exceptional performances during the pandemic.  Several of these plaintiffs were selling AstraZeneca's products with noteworthy success during the height of the pandemic.  The Supreme Court has reiterated on several occasions that otherwise illogical employment decisions frequently give rise to an inference of discriminatory animus.  *See Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978) (in justifying the presumption of intentional discrimination in Title VII cases "that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with some reason, based his decision on an impermissible consideration. . . .").

261.    AstraZeneca's justifications for terminating Plaintiffs Wilhoit, Dennard, Magers, and Marshall, and members of the Natural Immunity Religious Class are pretextual.

262.    The foregoing conduct constitutes illegal, intentional discrimination prohibited under 42 U.S.C. § 2000e-2 *et seq.*

263.     As a direct and proximate result of the discriminatory treatment experienced, Plaintiffs Wilhoit, Dennard, Magers, and Marshall are suffering the injuries and damages hereinafter described.  Accordingly, these plaintiffs request relief as hereinafter described.

## COUNT IV

### TITLE VII – DISPARATE TREATMENT – RELIGION
### 42 U.S.C. § 2000e-2(a)
**(On behalf of Plaintiffs Wilhoit, Dennard, Magers, Small, Rusgrove, and Marshall and the Religious Process Class)**

264.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

265.     This claim is brought by Plaintiffs Wilhoit, Dennard, Magers, Small, Rusgrove, and Marshall for themselves and on behalf of the Religious Process Class.  Many of these plaintiffs have filed timely charges with the EEOC indicating their intention to file a representative action relating to AstraZeneca's pattern and practice of religious discrimination and plaintiffs Rusgrove, Marshall, and Magers have received a Notice of Right to Sue from the EEOC.

266.     Plaintiffs Wilhoit, Dennard, Magers, Small, Rusgrove, and Marshall hold sincere religious beliefs in conflict with receiving a COVID-19 vaccine and were therefore precluded from complying with the Mandate.  In fact, these plaintiffs lost their livelihoods for holding true to their religious beliefs, demonstrating the intensity of their convictions.

267.     Throughout the accommodations process, neither the sincerity nor the religious nature of these plaintiffs' beliefs was ever personally questioned by AstraZeneca.   No plaintiff was personally contacted by a member of the accommodation review panel to clarify the sincerity or religious nature of their stated beliefs.

268.    Plaintiffs were otherwise qualified for their positions and were high performers in their respective roles.

269.    Plaintiffs and members of the Religious Process Class suffered adverse employment action because of their religious beliefs.

270.    Similarly situated secular employees were treated more favorably and were not subjected to adverse employment action.

271.    AstraZeneca could have accommodated Plaintiffs and members of the Religious Process Class without undue hardship, as demonstrated by the fact that AstraZeneca provided religious accommodations to many employees in similarly situated roles that Plaintiffs occupied.

272.    AstraZeneca could have achieved its workplace safety goals through methods other than forcing members of the Religious Process Class to choose between their faith and continued employment.  This reality is underscored by the late timing that AstraZeneca announced its Mandate.

273.    AstraZeneca instituted and then implemented its COVID-19 vaccination requirement very late relative to other companies who implemented a vaccination requirement in the Summer and Fall of 2021.  When it implemented the Mandate in January of 2022, the Omicron variant of COVID-19 was dominant, and AstraZeneca had actual knowledge that the available vaccines were ineffective at preventing contraction and transmission of COVID-19.  Additionally, as a cutting-edge vaccine manufacturer with hyper-specialized and up-to-date knowledge on this issue, AstraZeneca cannot feign ignorance of vaccine inefficacy on the date it announced the Mandate.

274.    Before instituting the Mandate, and with actual and constructive knowledge of vaccine inefficacy, AstraZeneca had actual knowledge that a very large portion of its unvaccinated workforce was unable to receive a COVID-19 vaccine for religious reasons.

275.    AstraZeneca engaged in an intentional, company-wide, and systematic policy, pattern, and/or practice of religious discrimination.  AstraZeneca has intentionally discriminated against Plaintiffs and the Class in violation of Title VII by, among other things:

a.  Implementing a corporate-wide religious accommodations scheme willfully intended to purge as many religious employees as possible.  The scheme was purposefully designed to grant or deny religious accommodation requests irrespective of the sincerity or religious nature of each employee's stated beliefs;

b.  Implementing a corporate-wide religious exemption and accommodations scheme that relied primarily not on individualized assessment, but rather on computer assisted technology.   This robotic procedure robbed Plaintiffs of the opportunity to have their religious exemption and accommodations' requests meaningfully and individually considered, as required by Title VII.   The algorithmic process produced absurd results, whereby employees who submitted virtually identical religious exemption requests received different outcomes (one accommodated, the other terminated);

c.  Utilizing computer assisted technology or otherwise non-individualized review to intentionally target members of the Christian faith for systematic elimination by sending auto-generated, standardized follow-up questions based on common Christian keywords such as "abortion", "Holy Spirit", "Christian", "church", and "Catholic," while not utilizing a similar process for other faith traditions.   This

process resulted in significantly higher numbers of the Christian faith to be terminated than employees from other faith traditions;

d. Willfully implementing a pretextual accommodations process whereby Plaintiffs were terminated on "undue hardship" grounds, while other employees in substantially equivalent roles were provided reasonable accommodations without any hardship whatsoever. AstraZeneca accommodated employees in substantially equivalent job roles as Plaintiffs. Consequently, AstraZeneca's assertions of undue hardship are either illegitimate (as they can clearly accommodate the job roles in question) or their methods were arbitrary and devoid of the individualized assessment required by Title VII; and

e. Refusing to consider alternative means of achieving its asserted business justification of 'protecting the workforce' that would not conflict with Plaintiffs' religious beliefs. Numerous accommodations were available that would pose no hardship to AstraZeneca whatsoever. Acknowledging natural immunity as an alternative to vaccination or granting telework until the risk of COVID-19 subsided, were both options that required no action or expense for AstraZeneca. Additionally, regular COVID-19 testing, which was granted as an accommodation for certain AstraZeneca employees (but inexplicably denied for others) could also have been offered as an option. Plaintiffs would have personally shouldered testing costs, or in most parts of the country during the relevant timeframes, could acquire free testing. Despite being made aware of such options, along with supporting evidence that those alternatives would be equally (or more) effective than requiring vaccination, AstraZeneca

willfully chose to impose and act upon the Mandate, which resulted in precisely what

AstraZeneca intended—a mass termination of certain religious employees.

276.    Considering AstraZeneca's otherwise relaxed safety protocols, its refusal to

recognize natural immunity, the late timing of the Mandate, the documented vaccine inefficacy on

the date of the mass termination, the non-personalized and robotic accommodation process, and

the fact that AstraZeneca accommodated a large portion of its workforce without undue hardship,

the workplace safety justification is pretext.  Plaintiffs were terminated because of their disfavored

religious beliefs.

277.    The foregoing conduct constitutes illegal, intentional discrimination prohibited

under 42 U.S.C. § 2000e-2 *et seq.*

278.    As a direct and proximate result of the discriminatory treatment experienced,

Plaintiffs are suffering the injuries and damages hereinafter described.  Accordingly, Plaintiffs

request relief as hereinafter described.

## COUNT V

### ADA – "REGARDED AS" – DISABILITY DISCRIMINATION
### 42 U.S.C. § 12102
### (On behalf of Plaintiffs Wilhoit, Dennard, Magers, Small, Rusgrove, and Marshall, and the Disability Class)

279.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if

fully set forth herein.

280.    This claim is brought by Plaintiffs for themselves and on behalf of the Disability

Class.  Many of these plaintiffs have timely filed charges with the EEOC indicating their intention

to file a representative action relating to AstraZeneca's pattern and practice of disability-based

discrimination.  Several plaintiffs have received a Notice of Right to Sue.

83

281.    AstraZeneca regarded Plaintiffs as though they were perpetually disabled and then terminated their employment on the basis of a perceived disability.

282.    AstraZeneca regarded Plaintiffs and those similarly situated as being perpetually infected with a contagious disease (COVID-19), and additionally or alternatively, perceived their immune systems of being permanently incapable of operating sufficiently to combat and prevent infection from COVID-19.

283.    AstraZeneca was very concerned that unvaccinated employees would burden their workforce due to their perceived disabilities.    Specifically, AstraZeneca believed (albeit mistakenly) that unvaccinated employees were at an increased risk to miss work and consequently to decrease company productivity.

284.    This is precisely the type of conduct Congress sought to eliminate when enacting the ADA.  *See, e.g., Deane v. Pocono Medical Center*, 142 F.3d 138, 143 n.5 (3d Cir. 1998) (with the "regarded as" prong, "Congress chose to extend the protections of the ADA to individuals who have no actual disability. The primary motivation for the inclusion of misperceptions of disabilities in the statutory definition was that "society's accumulated myths and fears about disability and diseases are as handicapping as are the physical limitations that flow from actual impairment.") (citing *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 284 (1987)).

285.    When denying Plaintiffs' requests for religious accommodation, AstraZeneca emphasized their concern that Plaintiffs would burden their workforce due to their decision to remain unvaccinated.   In highlighted blue font in the denial letters, AstraZeneca instructed that undue hardship "can include, but is not limited to, business disruption/increased costs resulting from illness-related absences."

84

286.    Further, when initiating the Mandate, AstraZeneca justified the new policy on grounds that data had shown that "vaccination is highly effective at preventing serious illness and death," further demonstrating the long-term, unacceptable liability Plaintiffs and members of the Disability class presented to AstraZeneca.

287.    The ADA prohibits employer discrimination against those employees who an employer regards as disabled, and then acts adversely against that employee because of the perceived disability.  *See* 42 U.S.C. § 12102 (1)(C) (defining disability under the Act as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; and (C) being regarded as having such an impairment").

288.    The ADA provides in relevant part:

> an individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

42. U.S.C. § 12101(3)(A).

289.    The ADA does not protect perceived disabilities that are both transitory and minor.  *Id.* at (3)(B). The ADA defines a "transitory impairment" as one with an "actual or expected duration of 6 months or less."  *Id.*

290.    By its actions, AstraZeneca demonstrated that it viewed Plaintiffs as though they possessed a disability that was neither transitory nor minor.  For approximately 10 months, by subjecting Plaintiffs to asymmetric safety protocols relative to its vaccinated employees, AstraZeneca treated Plaintiffs as though they were perpetually infected with COVID-19.

Additionally, during this same timeframe, AstraZeneca also treated Plaintiffs as though their immune system was disabled, unable to deal with the threat of COVID-19, and therefore that they were a productivity and financial liability to the company.

291.   AstraZeneca's perception of Plaintiffs' physical impairment relating to an immunodeficiency is evidenced by the asymmetric safety protocols imposed on unvaccinated employees, but not those employees who provided proof of COVID-19 vaccination.  Additionally, for those unvaccinated employees previously infected with COVID-19, AstraZeneca regarded those employees as potentially having "long-COVID" and at risk for future absence from work. AstraZeneca's actions in terminating these employees infers that the perceived "impairment", *i.e.*, a perpetual contagion hazard and perceived health risk to each plaintiff, was neither transitory nor minor.  *See* 42 U.S.C. § 12102(3).  In both instances, AstraZeneca regarded Plaintiffs and those similarly situated as disabled under the ADA.

292.   AstraZeneca cannot demonstrate, short of hypotheticals and speculation, that Plaintiffs and those similarly situated posed a direct threat to the workplace.  This is especially true for employees who possessed natural immunity as their immunity provided equal or superior protection to vaccine-based immunity.  Moreover, during the relevant timeframes, AstraZeneca's vaccinated employees were contracting COVID-19 at very high rates, meaning that Plaintiffs posed no more a direct threat than their vaccinated colleagues.

293.   AstraZeneca engaged in an unlawful pattern and practice of disability-based discrimination by terminating hundreds of employees on the basis of a perceived disability.

294.    In refusing to pay the Q1 bonuses to Plaintiffs and those similarly situated, AstraZeneca further denied privileges of employment to those it perceived as disabled under the ADA.

295.    As a direct and proximate result of the discriminatory treatment experienced, Plaintiffs are suffering the injuries and damages hereinafter described.  Accordingly, Plaintiffs request relief as hereinafter described.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and members of the Collective, the Natural Immunity Religious Class, the Religious Process Class, and the Disability Class pray for relief as follows:

A.  Grant a judgment requiring Defendant to pay appropriate back wages in an amount to be determined at trial, an equal sum of liquidated damages, and prejudgment interest to individuals whose wages are being unlawfully withheld as a result of the acts complained of above, including but not limited to, individuals covered by the ADEA who were subjected to adverse employment action because of their age;

B.  Order Defendants to make whole all individuals adversely affected by the unlawful employment practices described above, by providing the affirmative relief necessary to eradicate the effects of their unlawful employment practices, including but not limited to instatement, reinstatement, provide front pay in lieu of reinstatement, or otherwise make whole individuals denied employment because of their age;

C.  Certification of the action as a nation-wide collective action under the ADEA;

D.  Designation of Plaintiffs as representatives of the nation-wide collective action under the ADEA;

E.  Certify the Natural Immunity Religious Class under Federal Rule of Civil Procedure 23;

F.  Certify the Religious Process Class Federal Rule of Civil Procedure 23;

G.  Certify the Disability Class Federal Rule of Civil Procedure 23;

H.  Designation of Plaintiffs Wilhoit, Dennard, Magers, and Marshall as representative of the Natural Immunity Religious Class;

I.  Designation of Plaintiffs Wilhoit, Dennard, Magers, Small, Rusgrove, and Marshall as representative of the Religious Process Class;

J.  Designation of Plaintiffs Wilhoit, Dennard, Magers, Small, Rusgrove, and Marshall as representative of the Disability Class;

K.  Designation of Representative Plaintiffs' counsel of record as class and collective counsel;

L.  Enter a declaratory judgment declaring the actions of Defendant to be violations of the ADEA, Title VII, and the ADA;

M.  Issue a permanent injunction requiring Defendant to expunge the personnel files of members of the Collective, the Natural Immunity Religious Class, the Religious Process Class, and the Disability Class of any derogatory, false, or misleading information relating to this matter;

N.  Order Defendants to provide training for supervisors and managers at all corporate levels specific to the ADEA, Title VII, and the ADA;

O.  Award Plaintiffs and members of the Collective, the Natural Immunity Religious Class, the Religious Process Class, and the Disability Class back pay (including interest and benefits), reinstatement or front pay, pre-judgment and post-judgment interest, and compensatory damages;

P.  Award liquidated damages under the ADEA;

Q.  Award punitive damages under Title VII;

R.  Award punitive damages under the ADA;

S.  Award Plaintiffs reasonable attorneys' fees and costs; and

T.  Grant any other relief that the Court deems just, proper, and equitable.

## <u>JURY DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38 and 29 U.S.C. § 626, Plaintiffs demand a jury trial on all issues upon which there is a federal right to a jury trial.

(signatures of counsel on following page)

(continued from *Class and Collective Complaint and Demand for Jury Trial* on preceding page)

Dated: December 26, 2022

Respectfully submitted by,

**THE NEUBERGER FIRM, P.A.**


**/s/ Thomas S. Neuberger**

**THOMAS S. NEUBERGER, ESQ.** (#243)
**STEPHEN J. NEUBERGER, ESQ.** (#4440)
17 Harlech Drive
P.O. Box 4481
Wilmington, DE 19807
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

**SIRI | GLIMSTAD, LLP**
Elizabeth A. Brehm*
Walker Moller*
Laura Carroll*
745 Fifth Ave, Suite 500
New York, NY 10151
Telephone: (212) 532-1091
ebrehm@sirillp.com
wmoller@sirillp.com
lcarroll@sirillp.com

**Attorneys for Plaintiffs**

* *Pro hac vice* motion forthcoming